John Benjamin KENNEDY,
Jr., Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–79–365.

Court of Criminal Appeals of Oklahoma.

Feb. 3, 1982.

Rehearing Denied March 4, 1982.

---

John C. Forbes and R. Michael Cantrell, Cantrell, Gust & Forbes, Midwest City, Percy Foreman, Foreman & DeGuerin, Houston, Tex., for appellant.

Jan Eric Cartwright, Atty. Gen., David W. Lee, Asst. Atty. Gen., Chief, Crim. Div., Oklahoma City, for appellee.

OPINION

CORNISH, Judge:

The appellant, John Benjamin Kennedy, Jr., was convicted of Murder in the First Degree in Case No. CRF–78–2768 in the District Court of Oklahoma County. He was sentenced to life imprisonment.

Kennedy was tried for the murder of fifteen-year-old Yvonne Jolene McFaddin. The killing occurred on May 31, 1978, sometime after 8 p. m. and before 8:35 p. m. in Room 207 of the King's Inn Motel at Northwest Tenth and Robinson in downtown Oklahoma City. Earlier that afternoon, a man characterized as McFaddin's pimp, James Thompson, rented the motel room for her to use. At approximately 7 p. m., the victim was observed sitting on Thompson's green car in the parking lot of Eddie's Turf Club near Northwest Ninth and Hudson. State's witness, Scott Allen Terry, observed her talking to a man sitting in a brown Gran Torino and eventually leave with him. Terry made an in-court identification of Kennedy as being the driver of the Gran Torino.

The owner and operator of the motel testified he had seen the victim in the company of a large white male enter Room 207 around 8 p. m. The owner surmised that prostitution was occurring and the police were called. The owner's wife testified that sometime after 8 p. m. she saw a large white man running down the stairs of the motel; shortly thereafter she saw a dark-colored car driven by a man exit quickly from the motel's parking lot.

The motel owner, while working on outside lights, stopped Thompson, who was returning to the motel looking for McFaddin, and told him "to get going". When Thompson went to Room 207 he discovered the door was cracked open and the room was torn apart. He found the victim sitting in a dry bathtub wearing only a T-shirt and a black scarf around her neck. Her face was turning blue and blood was frothing from her mouth. He yelled to the owner for help and the two tried to revive her. The owner noticed a thin wire wrapped around her neck and removed it. McFaddin was declared dead on arrival at a hospital emergency room, and her corpse was taken to the State Medical Examiner's laboratory for an autopsy. The medical examiner found that the cause of death was ligature strangulation and that the nipples on both breasts had been avulsed, appearing to have been chewed away. There was no evidence of sexual intercourse. Investigators found no evidence in the motel room of blood stains or of the avulsed tissue, nor were they able to successfully lift fingerprints other than one identified as Thompson's palm print.

Among other exhibits, the State introduced into evidence items found in the appellant's car in a search conducted on June 22, 1978. Included were a pair of wire cutters and a six-inch piece of stainless steel wire of the same gauge as the stainless steel wire found around the victim's neck. The State also offered extensive bite-mark comparison evidence.

I

In this appeal the appellant challenges the admissibility of scientific and opinion evidence of bite-mark identification of the accused. This is a question of first impression in Oklahoma.

The appellant challenges both the qualifications of the State's expert witnesses and the reliability of bite-mark evidence as an identification technique. He argues that this evidence falls into the category of sci-

entific evidence which has not yet reached the stage of reliability through acceptance by the scientific community. He disputes its reliability—and therefore its relevancy—because there is no "accepted standard" established in the field of bite-mark identification.

Bite-mark comparison is a technique employed in the field of forensic odontology. Currently bite-mark comparison has received evidentiary acceptance in all eight of the jurisdictions in which its admission was sought.[1]

At an *in camera* hearing the trial court found that the State's witnesses, Dr. Richard Thomas Glass and Dr. Edward E. Andrews, were qualified to testify as experts and to give their opinions on the comparisons between the bite marks and the appellant's dentition.

Dr. Glass, a dentist and pathologist, serves as a consulting forensic odontologist for the Oklahoma Medical Examiner's office. He has been studying human bites and bite marks for the past ten years. He is Chairman and Associate Professor of Oral Pathology at the University of Oklahoma College of Dentistry and Medicine. He has also written an article on animal bite marks which appeared initially in the *Journal of Forensic Sciences*, as well as articles on other biological topics. His area of expertise also includes specialized structures that occur in the mouth, head and neck, and microorganisms found in the mouth. He is a diplomate of the American Board of Oral Pathology.

Dr. Andrews, a dentist who specializes in prosthodontics and maxillofacial prosthetics, also gives consultations in forensic odontology to the Oklahoma Medical Examiner's office. He has identified between 250 and 300 bodies based solely on their teeth. He is president of the American Society of Forensic Odontology. In the trial of *State v. Sager*, 600 S.W.2d 541, Mo.App., (1980), he was qualified as a bite-mark expert for the defense. He has worked in eight medical cases in Oklahoma involving bite marks, seven of which were caused by humans. Dr. Andrews has also published two articles in the *Journal of Forensic Sciences*.

The State presented expert witnesses who described with particularity the procedures and methods followed in photographing the bite marks on the victim, in making impressions and models of the bite marks, in obtaining impressions and preparing casts of the appellant's teeth, and in finding similarities between the bite marks and the accused's dentition.

Richard Reed, chief field agent for the medical examiner's office, testified that he photographed the wounds on the victim's breasts. Reed made one-to-one photographs using a special 200 millimeter medical Nikor lens, which has an extremely flat field, mounted on a Nikormat camera. To insure accuracy, a metric ruler was placed close to the breast wounds. At Dr. Andrews' request, Reed photographed the models which had been made of the appellant's teeth, using a three-to-one scale. Then he made positive and negative overlays of the biting surfaces of the teeth. Reed also made three-to-one black-and-white negatives of color slides he had taken of the breast wounds before the autopsy. Prints made of the wounds on the same scale could then be matched with the overlays made of the teeth.

Dr. Glass testified that he had made dental impressions and models of the appellant's teeth using accepted clinical techniques. During that procedure, he found

1. CALIFORNIA: *People v. Marx*, 54 Cal. App.3d 100, 126 Cal.Rptr. 350, 77 A.L.R.3d 1108 (1975); *People v. Watson*, 75 Cal.App.3d 384, 142 Cal.Rptr. 134 (1977); *People v. Slone*, 76 Cal.App.3d 611, 143 Cal.Rptr. 61 (1978); ILLINOIS: *People v. Johnson*, 289 N.E.2d 722, 8 Ill.App.3d 457 (1972); *People v. Milone*, 356 N.E.2d 1350, 2 Ill.Dec. 63, 43 Ill.App.3d 385 (1976); INDIANA: *Niehaus v. State*, 359 N.E.2d 513, 265 Ind. 655 (1977), *cert. denied* 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188; KANSAS: *State v. Peoples*, 605 P.2d 135, 227 Kan. 127 (1980); MISSOURI: *State v. Sager*, 600 S.W.2d 541, Mo.App. (1980); OREGON: *State v. Routh*, 568 P.2d 704, 30 Or.App. 901 (1977); SOUTH CAROLINA: *State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979); TEXAS: *Doyle v. State*, 159 Tex.Cr.R. 310, 263 S.W.2d 779 (1954); *Patterson v. State*, 509 S.W.2d 857 (Tex.Crim.1974).

that Kennedy had a gum disease, gingivitis, and that his teeth were malaligned. Serving as a consultant to the medical examiner's office, Dr. Glass also prepared microscopic slides of injured tissue sections. Using a light-polarizing lens on his microscope, he was able to detect a foreign material in the breast tissue sections which he believed to be calculus, a calcified substance which collects on teeth. He also detected the presence of a birefringent material which can be found in a human's mouth; and a type of bacteria which would not be found outside of the alimentary canal.

Dr. Glass testified that his gross examination findings were that the breasts appeared to have been gnawed, rather than cleanly incised. He said Kennedy had a Class III malocclusion, meaning that the mandible (the lower jawbone) is anterior to the maxilla (the upper jawbone). Dr. Glass stated that with such a malocclusion, a great deal of movement and pushing would be necessary to incise.

Dr. Glass further gave his opinion that the arch form of the bite marks indicated they had been caused by a human mouth.

The court held an *in camera* hearing to determine whether to admit evidence of Dr. Glass's comparisons between the models of the appellant's teeth and the models of the victim's breasts. At that time, Dr. Glass told the court that his opinion was based on the diameters and the inclinations of the teeth. He added that tests with photographic overlays increase the medical certainty. Additionally, he said that the numerous types of microorganisms present in the wounds were consistent with a finding that the bites had been made by someone who had a significant amount of gingivitis.

The evidence being allowed, Dr. Glass testified he was of the opinion that the models of the appellant's teeth were consistent with the bite marks on the victim's breasts.

The State's other expert witness, Dr. Andrews, described how he used alginate, a generally accepted impression material which has an accuracy within one-thousandth of an inch, to make impressions of the bite marks. From these, stone models were made to produce positives of the breast wounds.

Dr. Andrews testified extensively describing the consistencies he found when comparing the photographic overlays of the appellant's dentition to the bite marks. These photographic comparisons were shown in detail to the jury. He demonstrated forty points of comparison and testified he had found all teeth marks of the appellant to be consistent with the marks on both breasts.

Dr. Andrews, in showing that the outlines of the multiple wounds were consistent with the outline of the surfaces of the teeth, also testified that the crowding of the lower anterior teeth produces a specific bite pattern. Using the stone models, he demonstrated to the jury how the left and right central incisors, which are malaligned, fit into a wound on the right breast. Likewise, he showed that the upper left central incisor fit into a bite mark on the left breast.

Dr. Andrews further testified that he had taken models of James Thompson's teeth and compared them against the bite marks. He found numerous discrepancies which he said excluded Thompson as a suspect. He stated that one discrepancy between a bite mark and a suspect's teeth would exclude that suspect. He stated he had found no discrepancies between Kennedy's dentition and the bite marks. It was Dr. Andrews' opinion that "within reasonable medical probability" Kennedy had caused the bite marks on both breasts.

Drs. Glass and Andrews both agreed during cross-examination with the following statements: (1) that the state of the art of bite-mark identification does not yet allow experts to make an absolutely positive identification; (2) that authorities unanimously agree that it is easier to show that bite marks were not made by a suspect than that they were; and (3) that human skin is a poor medium for bite-mark registration.

The defense presented its own expert witness in forensic odontology, Dr. James

D. Woodward, a professor in dentistry at Oral Roberts University since 1977, and a consultant to the Oklahoma Medical Examiner. He was formerly a faculty member at the University of Oklahoma College of Dentistry and specializes in prosthodontics. He is. a diplomate of the American Board of Forensic Odontology and has also published articles on forensic dentistry. In approximately six instances Dr. Woodward has dealt with human bite marks on deceased victims. He has also made about one hundred identifications of bodies based on their teeth.

Dr. Woodward, qualified as an expert by the court, offered testimony to refute the State's witnesses' opinions. He demonstrated to the jury how he had arrived at his opinion that there were inconsistencies between the appellant's dentition and the bite marks. Dr. Woodward also testified that x-rays of the appellant's mouth showed bone destruction, which would have had to occur over a period of several months. He found that the root of the left central incisor had been abscessed for a long time. Woodward distinguished between a chronic abscess, where there is an infection but no constant pain or swelling; and an acute abscess, where there is. The defense offered this testimony to try to show that during the time in question Kennedy's tooth was abscessed and that he therefore could not have done the biting. However, a Dr. Lucas, Kennedy's dentist who treated the abscessed tooth on June 20, testified that though the infection had been present for some time, the pain would not necessarily have been present at all times.

The introduction of expert testimony is controlled by Laws 1978, c. 285, § 702, now 12 O.S.Supp.1981, § 2702, which provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." Additionally, § 2704 of that title provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

This Court defines an "expert witness" as one who is possessed of scientific knowledge acquired by study or practice, or by both. He is ordinarily a person who has experience and knowledge in relation to matters which are not generally known. *Harvell v. State*, 395 P.2d 331 (Okl.Cr.1964). The decision as to the sufficiency of qualifications of potential expert witnesses is within the sound discretion of the trial court. *Riggle v. State*, 585 P.2d 1382 (Okl. Cr.1978).

To determine the admissibility of bite-mark comparison evidence the trial court followed a three-prong test established in California. In that case, *People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976), the California court wrote that the admissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. Additionally, the California court wrote that the proponent of the evidence must demonstrate that correct scientific procedures were used.

We are of the opinion that the trial court made a fair and informed decision in qualifying these witnesses as experts to give their opinion testimony and to present evidence of bite-mark comparisons.

We cite with approval the leading California case on bite-mark identification, *People v. Marx*, 54 Cal.App.3d 100, 126 Cal. Rptr. 350, 77 A.L.R.3d 1108 (1975). There, the Court of Appeals emphasized that the bite-mark evidence was trustworthy because the basic data on which the experts based their conclusions were verifiable by the court. In *Marx*, as here, the trier of fact was shown models, photographs, and overlays of the victim's wounds and the accused's teeth. The jury and the judge could see the extent to which the bite marks conformed to his teeth.

The *Marx* court went on to hold that "in admitting the evidence the court did not have to sacrifice its independence and common sense in evaluating it." In arriving at their conclusions, the "experts applied scientifically and professionally established techniques—x-rays, models, microscopy, photography—to the solution of a particular problem which, though novel, was well within the capability of those techniques."

Similarly the Supreme Court of Kansas wrote in *State v. Peoples*, 227 Kan. 127, 605 P.2d 135, 139 (1980):

"We think bite-mark identification by an expert witness is sufficiently reliable and can be a valuable aid to a jury in understanding and interpreting evidence in a criminal case. When the witness has the requisite skill and experience, and demonstrates the accuracy and reliability of his models, photographs, x-rays and supporting exhibits in bite-mark identification, the trial court in the exercise of its power of discretion may properly admit the opinion testimony of the expert witness." *Accord, State v. Sager*, Mo. App., 600 S.W.2d 541 (1980).

The bite-mark evidence was based on visual comparisons between the wounds and the appellant's dentition to determine if they are reciprocal. The means and techniques for making the models for comparison are complex, but they are based on standardized procedures known to produce accurate measurements. Although bite-mark comparison evidence has had limited application, we believe that given the proper foundation such evidence is admissible in a criminal proceeding. We find that a proper foundation was laid in this case.

■ Once the trial court ruled on the competency of the experts and the admissibility of the scientific technique, the weight and credibility of the experts' opinions became a question for the jury. *Riggle v. State, supra*. The experts accompanied their testimony with in-court demonstrations, photographic presentations, x-rays, and models to show the jury the bases for their opinion evidence. Any discrepancies went to the weight of the evidence.

■■ We adopt the holding of the Kansas Supreme Court in *State v. Peoples, supra*, that bite-mark comparisons by an expert witness are sufficiently reliable and can be a valuable aid to a jury in understanding and interpreting evidence in a criminal trial. The trial court, in the exercise of its discretion, properly admitted the opinion testimony of the expert witnesses. Accordingly, we find no error.

## II

We next turn to the proposition that it was error to deny admission of dental models of persons known to be unrelated to the homicide. The defense sought to compare those models to the accused's dentition and to the bite marks to show purported similarities. The trial court excluded these exhibits on the basis that they lacked relevancy.

■■ The test for relevancy is whether the evidence has any tendency to make more or less probable a material fact in issue. *President v. State*, 602 P.2d 222 (Okl. Cr.1979). These exhibits may have been relevant to refute the uniqueness of the dentition which caused the bite marks and should have been admitted. However, the jury heard testimony from both of the State's expert witnesses that it is not possible to make an absolutely positive identification through bite-mark comparisons. And, the critical issue—whether there were any inconsistencies between the appellant's unusual dentition and the bite marks—was fully developed by the prosecution and defense. When considering the entire record the error does not justify reversal.

■ A related issue raised is that four slides of the victim's breasts shown by the State were gruesome and should not have been admitted. The projected slides, however, were shown to clarify the orientation of the bite marks on the body of the deceased. We find these particular slides to have had probative value, and were not unduly prejudicial. The trial court properly exercised its discretion in admitting them. *President v. State, supra*.

## III

The appellant asserts that the lineup in which he was identified was impermissibly suggestive and that the subsequent in-court identification should have been excluded.

This Court in *Thompson v. State*, 438 P.2d 287, 289 (Okl.Cr.1968), set out procedures to insure the validity of a lineup identification and to reduce the likelihood that in-court identifications would be tainted by improper pretrial lineups. In his brief the appellant quotes four of the *Thompson* procedures, yet in his argument he only discusses non-compliance with Guideline No. 3, which pertains to physical similarities of the participants.

In *Lee v. State*, 600 P.2d 344 (Okl.Cr. 1979), we explained that these procedures are recommended, not required. Failure to follow each and every procedure recommended is not, *per se*, grounds for reversal where there has been substantial compliance with the *Thompson* guidelines.

Two of the State's witnesses, Scott Allen Terry and Ray Brown, identified the appellant at the pretrial lineup. At the time of the lineup, the appellant was six feet, six inches tall, weighed 290 pounds, and had light brown hair. Of the men appearing with the appellant, one weighed 220 pounds and was six feet, one inch tall; two each weighed 235 pounds and were six feet, three inches tall; and one weighed 210 pounds and was six feet, six inches tall. Their ages ranged from twenty-three to twenty-seven, with the appellant being twenty-three. All had brown hair. The lineup took place on June 29, a month after the killing.

 The guidelines suggested in *Thompson* were substantially followed. Furthermore, there was ample opportunity for observation of the accused by the respective witnesses, providing an independent source of reliability. *See Green v. State*, 594 P.2d 767 (Okl.Cr.1979), and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

Terry testified that he had observed the victim and the appellant at approximately 7:00 p. m. on the day in question while he was waiting for a ride home from work. Terry watched the victim talk to the driver of a brown two-door Gran Torino in the parking lot of a bar for about ten minutes. Terry made these observations during daylight hours from a distance of approximately sixty feet. After the girl got into the car, the driver pulled out and looked in Terry's direction. Terry, having said he had had a "good look" at the driver's profile as well as his face, made a positive in-court identification of the appellant as the driver.

Ray Brown testified that at approximately 8:00 p. m. he had seen a large white male and the victim walk away from a brown car parked in the King's Inn parking lot. He estimated the man was about six feet, four inches tall and weighed between 290 and 300 pounds. He saw them walk up the motel stairs from a distance of about sixty yards. As Brown was walking toward his own room, he saw the man and girl enter Room 207, which was almost directly across from Brown's room. Brown said that about 25 minutes later he saw the man run out of the room to his car and drive off.

In court Brown stated that the appellant looked like the man he had seen on the evening in question. Brown said that the appellant had shorter hair, a mustache, and was thinner, but that he "still looks like him." On cross-examination Brown was asked if the accused were the same man. He replied, "Well, I can't say it's the man, but it looks like him."

Brown failed in court to *positively* identify the appellant. However, we have long held that when testimony as to the identification of a defendant is not absolutely certain, the uncertainty goes to its weight, rather than to its competency. *Stout v. State*, 41 Okl.Cr. 42, 270 P. 90 (1928). Accordingly, we find no error.

## IV

The appellant alleges that the trial court erred when it admitted items which had been seized from Kennedy's car as well as physical evidence which had been taken from his person.

During the course of the trial, an *in camera* hearing was held on the defense's motion to suppress the evidence in question. The trial court denied the motion and found that the appellant's oral consent to the taking of hair and saliva samples was voluntarily given and valid, as were the written waivers for the making of dental impressions and for the search of his car.

■ One of the established exceptions to the requirement of both a warrant and probable cause is a search that is conducted pursuant to a voluntary consent. *United States v. Speers*, 429 F.Supp. 188 (D.C.Okla. 1977); *accord, Nelson v. State*, 564 P.2d 254 (Okl.Cr.1977).

■ In challenging the voluntariness of his consent, the appellant contends an unreasonable amount of psychological pressure was exerted upon him and that his will was "overborne." In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), the United States Supreme Court held that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."

Here the appellant, age 23, gave his cooperation in an atmosphere which could hardly be characterized as coercive. On June 22 he had been stopped by police because the car he was driving closely matched one described in a police flyer in connection with the McFaddin homicide. After receiving the *Miranda* warnings, he voluntarily accompanied the officer to the police station. There, he was again advised of his rights and was told the purpose of the investigation. The investigator requested samples of physical evidence from his person and he cooperated. He also signed a waiver to allow the police to search his car. Each time before giving his consent he was advised of his rights. And, it was repeatedly made clear to him that he was not obligated to consent. After his initial interview he was allowed to leave the police station. He returned later to submit to the dental procedures after being asked on the telephone

if he would cooperate. The record reflects the samples were properly taken only after he had been advised of his constitutional rights and that he made no objection to the taking of them. *State v. Perez*, 614 P.2d 1112 (Okl.Cr.1980).

His assertion that he would never have consented to these searches if he had believed that he would not be eliminated as a suspect does not vitiate the voluntariness of his consent, nor does it indicate the presence of duress or police coercion. The totality of the circumstances—the characteristics of the accused and the details of the investigation—show that the appellant's will was not overborne. Having been preceded by the appellant's free and voluntary consent, the warrantless searches were therefore not unreasonable. *Holmes v. State*, 568 P.2d 317 (Okl.Cr.1977).

V

■ The appellant asserts error in numerous instances when the trial court refused to grant his motions for mistrial. In absence of fundamental error, we address only those assertions supported by legal argument and citations to authority. *Wofford v. State*, 581 P.2d 905 (Okl.Cr.1978).

■ He first attacks remarks made by the prosecution in its opening statement as being misleading and in bad faith. Failure to prove all remarks in opening statement in absence of a showing of bad faith and prejudice, is not grounds for reversal. *Ragland v. State*, 404 P.2d 84 (Okl.Cr.1965). We have carefully examined the record and find that the prosecution made no statements upon which error can be predicated. Furthermore, the defense did not object to the comments complained of nor did he argue this contention in his request for a mistrial. The issue was therefore waived for purposes of appeal. *See Jones v. State*, 557 P.2d 447 (Okl.Cr.1976).

■ Next the appellant urges error due to improper cross-examination of two character witnesses testifying for the defense. In the first instance the trial court struck the prejudicial statements by the prosecutor

concerning the accused's prior misdemeanor conviction in Florida. It also admonished the jury to disregard the remarks, and asked the jurors if they understood the admonition. In considering the nature of the error and the evidence, the error does not appear to have determined the verdict. We find the admonishment cured the error. *Lee v. State*, 572 P.2d 260 (Okl.Cr.1977).

In the second instance it is alleged the prosecution exceeded the proper scope of cross-examination when it introduced evidence of other crimes to rebut the appellant's trait of law-abidingness. The appellant claims the defense counsel had confined his direct examination to the issue of whether the appellant had a reputation for truth and veracity to prove good character.

The applicable statute is 12 O.S.1980, § 2405(A), which provides:

"A. Where evidence of a person's character or trait of character is admissible, proof may be by testimony as to reputation or by testimony in the form of opinion. *Inquiry is allowable on cross-examination into relevant specific instances of conduct.*" (Emphasis added.)

■ The extent of cross-examination with respect to the appropriate subject rests within the sound discretion of the trial court. *Delaney v. State*, 507 P.2d 564 (Okl. Cr.1973). The inquiry was relevant in ascertaining if the witness had been aware of the convictions, and, if so, in what way they affected his opinion of the accused's character. *See Custer v. State*, 561 P.2d 75 (Okl. Cr.1977).

Additionally, the evidence came out when the State cross-examined the accused. For impeachment purposes, the evidence of a petit larceny conviction was properly admitted under 12 O.S.1980, § 2609; however, evidence of a trespass conviction was not. The admission of that misdemeanor offense for impeachment purposes was improper since it is not a crime which involved dishonesty or false statement. *See* 12 O.S. 1980, § 2609(A)(1). It did not, however, materially prejudice the appellant's right to a fair trial.

■ The appellant also challenges the propriety of remarks made by the prosecution in his closing argument. After reviewing the remarks, we find that the prosecutor did not go beyond the bounds established for closing argument. The right of argumentation contemplates liberal freedom of speech and range of discussion; illustration and argumentation is wide. Both sides may discuss fully from their standpoints the evidence and inferences and deductions arising therefrom. Only when improper conduct affects the appellant's rights can a reversal be justified. *Frazier v. State*, 607 P.2d 709 (Okl.Cr.1980).

VI

The next issue involves chain of custody questions. The appellant objected to the introduction of the stone models of the deceased's breasts because Dr. Andrews' personal office, where they had been kept, was not locked at the time the models were turned over to Richard Reed. Dr. Andrews, however, identified in court the models which had been initialed by him.

■ The rule regarding the adequacy of the chain of evidence is that the party offering demonstrative evidence must show with reasonable certainty there has been no alteration of or tampering with the exhibit. This burden, however, is not so absolute that all possibility of alteration must be negated. *Hauschildt v. State*, 554 P.2d 77 (1976). Even where there may be the barest speculation that tampering could have occurred, it is proper to admit the evidence and let what doubt there may be go to its weight. *Trantham v. State*, 508 P.2d 1104 (Okl.Cr.1973).

■ No evidence was presented that would render the chain of custody deficient. The allegation that there was a possibility for tampering is nothing more than speculation. Therefore, the exhibits having been properly identified were correctly admitted. *Hays v. State*, 617 P.2d 223 (Okl.Cr.1980).

■ Likewise, we find no error in admitting other physical evidence which included laboratory swabbings, blood samples,

and fingernail clippings which were taken during the autopsy at the medical examiner's office, sealed in an envelope, and turned over to laboratory technicians at the Oklahoma State Bureau of Investigation. The chain of possession was substantially established through testimony of those who had handled the evidence.

## VII

The appellant contends the trial court improperly instructed on circumstantial evidence.

He asserts the trial court erred in substituting "reasonable conclusion" for "reasonable hypothesis." However, this Court has held that circumstantial evidence must be such as to exclude every *reasonable hypothesis or conclusion.* *Hardy v. State*, 562 P.2d 943 (Okl.Cr.1977). No error occurred, nor did the defense state the specific grounds for objection on this point at trial. *See Lane v. State*, 572 P.2d 991 (Okl.Cr.1978).

## VIII

■ During the formal sentencing proceedings a television camera, a still camera, and a radio sound device were permitted in the courtroom. The defense objected.

The U. S. Supreme Court in its recent decision of *Chandler v. Florida*, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981), upheld the Florida Supreme Court's authority to promulgate its revised Canon 3A(7) of the Florida Code of Judicial Conduct. That Canon permits electronic media and still photography coverage of judicial proceedings, subject to certain conditions.

The Supreme Court held that the Constitution does not prohibit a State from experimenting with a program such as the one authorized by Florida's Canon 3A(7). In so doing it stated that the opinion in *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1964), does not represent a *per se* constitutional rule forbidding all electronic coverage. The Oklahoma Supreme Court has also promulgated revised Canon 3A(7).

As in Florida, the Oklahoma Supreme Court guidelines place positive obligations on trial judges to insure protection of the accused's fundamental rights to a fair trial.

In pertinent part the guidelines in Canon 3A(7) of the Oklahoma Code of Judicial Conduct found in 5 O.S.Supp.1980, Ch. 1, App. 4, provide:

"(7) A judge may permit broadcasting, televising, recording and taking photographs in the courtroom during sessions of the court, including recesses between sessions, under the following conditions:

. . . . .

(e) No photographing, or broadcasting by radio or television of any portion of any criminal proceeding, and continuing *until the issues have been submitted to the jury for determination,* unless all accused persons who are then on trial shall have affirmatively, on the record, given their consent to the photographing or broadcasting." (Emphasis added.)

We find no prejudice to the rights of the accused particularly where coverage was permitted only during the formal sentencing stage of the proceedings after the issues had been submitted to the jury for determination.

## IX

Lastly, Propositions 4, 9, 10, 11, 12, 13, 15, and 16 are devoid of citation of authority. We have examined these assignments of error and find that the appellant has not been deprived of any fundamental rights. *Perez v. State*, 614 P.2d 1112 (Okl.Cr.1980).

As to the appellant's final proposition that an accumulation of error justifies reversal, we find no merit. *Grizzle v. State*, 559 P.2d 474 (Okl.Cr.1977).

The judgment and sentence is hereby AFFIRMED.

BRETT, P. J., and BUSSEY, J., concur.