STATE of Wisconsin, Plaintiff-Respondent,
v.

Robert Lee STINSON, Defendant-Appellant.

Court of Appeals

*No. 86–0002–CR. Submitted on briefs September 2, 1986.—Decided October 28, 1986.*

(Also reported in 397 N.W.2d 136.)

For the plaintiff-respondent, the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, and *Michael R. Klos,* assistant attorney general.

For the defendant-appellant, the cause was submitted on the briefs of *Michael D. Mandelman* of Milwaukee.

Before Moser, P.J., Wedemeyer and Sullivan, JJ.

MOSER, P.J. Robert Lee Stinson (Stinson) appeals from a judgment of conviction for first-degree murder, party to a crime, contrary to secs. 940.01 and 939.05, Stats. A jury found him guilty of the charges. On appeal, Stinson raises the following issues: (1) Did the trial court err in admitting expert testimony on bite mark identification? (2) Was there sufficient evidence to support the jury verdict of first-degree murder? (3) Did the trial court err in limiting defense counsel's closing argument? (4) Did the trial court err in denying Stinson's request to discharge defense counsel and substitute new counsel? After considering each issue and reviewing the record, we affirm the conviction.

On the morning of November 3, 1984, seventy-three-year old Ione Cychosz (Cychosz) was found dead in a backyard area near her home. Cychosz was last seen by a friend who drove her home shortly after midnight on November 3. The friend testified that before she drove away she watched Cychosz go up to her house and then walk around to the back of the residence.

Cychosz's body was discovered at 6:30 a.m. by a neighbor as he passed by the yard on his way to work. Cychosz had been beaten to death; her clothing and personal effects were scattered around the yard. According to medical testimony, Cychosz died of multiple internal injuries due to a beating. In addition, the par-

ties stipulated that spermatozoa were found in the vaginal wash of Cychosz, but the number of cells was too few for identification purposes. Time of death was estimated to be between midnight and 2 a.m.

The medical examiner testified that upon examining the victim, she discovered bite marks on the breast, abdomen and upper pubic region of the body. In her opinion, the bite marks had been inflicted prior to death.

At trial, the state presented two experts in the field of forensic odontology who testified on the subject of bite mark identification.[1] Both experts concluded, to a reasonable degree of scientific certainty, that the bite marks on the victim had been inflicted at or near the time of death, and that Stinson was the only person who could have inflicted the wounds. The first issue Stinson raises on appeal concerns the admission of this bite mark evidence, which presents a question of first impression in Wisconsin.[2] Because the major issue on

---

[1] Bite mark analysis seeks to identify persons by comparing their dentition, i.e., the kind, number and arrangement of their teeth, to a bite registration in flesh or other material. The technique is a specialized subset of forensic odontology, which is the application of dentistry to the law. *See* Note, *The Admissibility of Bite Mark Evidence,* 51 S. Cal. L. Rev. 309, 309 (1978).

[2] Currently, bite mark comparison has received evidentiary acceptance in nineteen jurisdictions. No jurisdiction has rejected the admission of such evidence. *See Bludsworth v. State,* 646 P.2d 558, 559 (Nev. 1982); *Bundy v. State,* 455 So. 2d 330, 336–37 (Fla. 1984); *Chase v. State,* 678 P.2d 1347, 1350 (Alaska Ct. App. 1984); *Commonwealth v. Cifizzari,* 492 N.E.2d 357, 362–63 (Mass. 1986); *Kennedy v. State,* 640 P.2d 971, 978 (Okla. Ct. App. 1982); *Niehaus v. State,* 359 N.E.2d 513, 516 (Ind. 1977), *cert. denied,* 434 U.S. 902 (1977); *Patterson v. State,* 509 S.W.2d 857, 863 (Tex. Crim. 1974); *People v. Marx,* 54 Cal. App. 3d 100, 112, 126 Cal. Rptr. 350, 357

appeal is the admissibility of these opinions, we will summarize in some detail the expert testimony in the case.

Dr. Lowell Thomas Johnson (Dr. Johnson),[3] a practicing dentist and a clinical professor of pathology at Marquette University School of Dentistry, testified for the state. On November 3, 1984, Dr. Johnson was called by the medical examiner and asked to examine the victim's body. Upon examining Cychosz, Dr. Johnson discovered eight complete or partial bite marks. To preserve this evidence, Dr. Johnson had a photographer from the state crime laboratory photograph the bite marks. Dr. Johnson then made a rubber impression of the victim's right breast which contained the greatest number of three-dimensional indentations. According to Dr. Johnson, when the wounds are three-dimensional, or when there are any indentations present, they can be well preserved by taking an impression of them. This impression is then later used to produce a static replica of the bite marks which will not be subject to distortion.

---

(1975); *People v. Middleton*, 429 N.E.2d 100, 101 (N.Y. 1981); *People v. Milone*, 356 N.E.2d 1350, 1360 (Ill. App. 1976); *Smith v. State*, 322 S.E.2d 492, 493 (Ga. 1984); *State v. Asherman*, 478 A.2d 227, 242 (Conn. 1984); *State v. Garrison*, 585 P.2d 563, 566 (Ariz. 1978); *State v. Green*, 290 S.E.2d 625, 630 (N.C. 1982); *State v. Howe*, 386 A.2d 1125, 1131–32 (Vt. 1978); *State v. Jones*, 259 S.E.2d 120, 125 (S.C. 1979); *State v. Peoples*, 605 P.2d 135, 139 (Kan. 1980); *State v. Routh*, 568 P.2d 704, 705 (Or. App. 1977); *State v. Sager*, 600 S.W.2d 541, 573 (Mo. Ct. App. 1980), *cert. denied*, 450 U.S. 910 (1981).

[3] The state presented two expert witnesses who testified on the subject of bite mark identification. The defense did not object to the qualifications of these witnesses to offer an expert opinion. The defense did not have an expert testify. During trial, an expert retained by the defense was present; however, he was never called to testify.

Dr. Johnson also testified that as part of established procedure, he preserved some of the tissue from the deeper bites. This was done by affixing an acrylic ring to the tissue surrounding the indentations and then removing that block of tissue for future study.

In addition to examining Cychosz, Dr. Johnson also did a complete forensic workup on Stinson. As part of the workup, a special camera was used to photograph the biting and facial surfaces of the teeth. A set of rubber impressions were then taken so a model of Stinson's teeth could be prepared. In addition, Dr. Johnson examined Stinson's teeth to observe the presence of defective or decayed teeth, or teeth which had been artificially restored.

Dr. Johnson also performed a similar dental workup on Robert Earl Stinson, the defendant's twin brother. Based on his comparison of the evidence taken from the victim with the models of Robert Earl's teeth, Dr. Johnson concluded that there were some gross discrepancies which would rule out Robert Earl Stinson as having possibly made the bite marks.

Dr. Johnson next testified extensively on the comparisons he made using the dental impressions of Stinson's teeth and the bite marks found on the victim's body. He described and demonstrated the methods he used in making these comparisons. First, a comparison was made using the model of the bite marks and the model of Stinson's teeth. A comparison was also made by placing the model of Stinson's teeth over photos of the bite marks to see if the features were consistent. In addition, Dr. Johnson used an overlay technique, which he stated was another standard procedure in bite mark comparison. By taping a black and white negative of Stinson's teeth over a color transparency of the bite

mark, Dr. Johnson was able to compare the patterns of the bite marks with the patterns of the teeth. Based on these comparisons, Dr. Johnson concluded that the bites he examined on Cychosz "had to have been made by teeth identical in all of these characteristics to those that I examined on Robert Lee [Stinson]."

The state also called Dr. Raymond Rawson (Dr. Rawson), a forensic odontologist, who, as chairman of the Bite Mark Standards Committee of the American Board of Forensic Odontologists, participated in formulating the standards and procedures for evaluating bite mark evidence. Dr. Rawson was asked to conduct an independent evaluation of the bite mark evidence using Dr. Johnson's models and photos. Dr. Rawson testified that the evidence in the case was "high quality" and "overwhelming." He stated that this was an "exceptional" case because "[t]here were more . . . pieces of evidence than you usually see in a bite mark case."

After examining Dr. Johnson's workup, Dr. Rawson stated that the methods Dr. Johnson used in gathering the evidence complied with the standards of the American Board of Forensic Odontology. Dr. Rawson then analyzed the evidence and concluded, to a reasonable degree of scientific certainty, that Stinson had inflicted the bite marks found on Cychosz's body.

Dr. Rawson also reviewed the evidence produced from the examination of Stinson's twin brother. Dr. Rawson testified that after an extensive analysis of the similarities and differences between the two brothers' mouths, he found significant discrepancies in their dentition. Therefore, Dr. Rawson concluded, Robert Earl Stinson could not have inflicted the bite marks found on Cychosz's body.

231

During trial, defense counsel requested a hearing on the admissibility of the bite mark evidence. At the end of the hearing, the state requested that the court deny Stinson's motion to exclude the evidence. The state argued that because there are sufficient standards and guidelines in the field of forensic odontology, it therefore is a field in which an expert opinion would be helpful to the jury. The court agreed, stating:

> I will deny the motion of the defense to exclude the evidence. . . . I'm going to find that there is sufficient evidence at this motion to find that there are adequate standards and controls in the area of forensic odontology, specifically for the identification of an individual through bitemark [sic] evidence and that that area of science is an accepted area of signs [sic], a recognized area of science . . . .

Stinson now contends that the trial court "acted with haste" and erred in admitting the testimony on bite mark identification. We disagree.

██

When reviewing evidentiary issues, the question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record.[4] This court will not find an abuse of discretion if there is a reasonable basis for the trial court's determination.[5] For such a discretionary decision to be upheld, however, there should be evidence in the record that discretion was in fact exer-

---

[4] *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983) (citation omitted).

[5] *Id.*

cised and the basis for that exercise of discretion should be set forth.[6]

The defense in this case contends that the state of the scientific knowledge in the subject of bite mark identification is not sufficiently developed to allow a reasonable opinion to be asserted by an expert. To support this argument, Stinson relies on the following language in *In re Adoption of R.P.R.:*[7]

> The elements of admissible expert testimony are: (1) the subject is distinctively related to some science, profession, business or occupation and therefore beyond the realm of the average layman; (2) the expert has sufficient skill in the area to aid the trier of fact in his search for the truth, and (3) *the state of the pertinent art or scientific knowledge in the subject is sufficiently developed to allow a reasonable opinion to be asserted by an expert.* [Citation omitted and emphasis added.]

While Stinson acknowledges that *R.P.R.* has been reversed, he argues that in its decision to reverse, our supreme court did not criticize the legal analysis applied by the Court of Appeals in the case. Stinson contends this court should now take the opportunity to reiterate the legal analysis applied in the case. We disagree and conclude that Stinson's reliance on *R.P.R.* is erroneous in light of our supreme court's recent ruling in *State v. Walstad.*[8]

In *Walstad,* our supreme court expressly rejected the application of the *Frye*[9] rule in Wisconsin. The stan-

---

[6] *Id.* (citation omitted).

[7] 95 Wis. 2d 573, 590, 291 N.W.2d 591, 599 (Ct. App.), *rev'd,* 98 Wis. 2d 613, 297 N.W.2d 833 (1980).

[8] 119 Wis. 2d 483, 351 N.W.2d 469 (1984).

[9] *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).

233

dard for admissibility in *Frye* required general acceptance of the scientific principle underlying the evidence offered.[10] We conclude that the test we applied in *R.P.R.* contains nothing more than a variation of the *Frye* rule and therefore should be rejected. *Walstad* states that evidence given by a qualified expert is admissible irrespective of the underlying scientific theory.[11]

Under *Walstad*, to be admissible, expert scientific testimony must be relevant, sec. 904.01, Stats.,[12] and the expert must be qualified by virtue of sec. 907.02, Stats.[13] Section 907.02 provides that if scientific or specialized knowledge will assist the trier of fact to determine a fact in issue, a qualified expert may testify based upon his knowledge, skill, experience or training. As the commentary to the rule points out, under Rule 907.02, expert testimony is admissible if relevant and will be excluded only if the testimony is superfluous or a waste of time. The testimony's reliability, after relevancy and expert qualifications are established, is a credibility issue for the fact finder.[14]

In *Walstad*, the court stated that the fundamental determination of admissibility comes at the time the witness is "qualified" as an expert.[15] In this case, how-

---

[10] *Id.* at 1014.

[11] *Walstad, supra* note 8, at 518, 351 N.W.2d at 487.

[12] Wisconsin Rule of Evidence 904.02 provides that "[a]ll relevant evidence is admissible . . . ." Under Rule 904.01, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[13] *Walstad, supra* note 8, at 516, 351 N.W.2d at 486.

[14] *State v. Shaw*, 124 Wis. 2d 363, 367, 369 N.W.2d 772, 774 (Ct. App. 1985).

[15] *Walstad, supra* note 8, at 518–19, 351 N.W.2d at 487.

ever, there was no question that Dr. Johnson and Dr. Rawson were qualified as experts in the field of forensic odontology. The defense never objected to the qualifications of these witnesses. In addition, the defense also never objected to the relevancy of the bite mark evidence in assisting the trier of fact in determining whether it was Stinson who inflicted the bite marks found on Cychosz. Therefore, it was not unreasonable for the trial court to admit the expert testimony on bite mark identification.

█

We conclude that bite mark identification evidence presented by an expert witness can be a valuable aid to a jury in understanding and interpreting evidence in a criminal trial. The bite mark evidence presented in the case enabled the jury to see the comparisons being made by the experts. By looking directly at the physical evidence used, the models and the photos, the jury was able to judge for itself whether Stinson's teeth did in fact match the bite marks found on the victim's body. We hold that the trial court did not abuse its discretion in admitting this evidence.

## SUFFICIENCY OF EVIDENCE

Stinson next argues that the evidence produced at trial was insufficient to support a jury verdict of first-degree murder. Stinson contends that the state's case, to a great extent, was dependent upon the introduction of the bite mark evidence, with no direct evidence produced linking him to the murder.[16] Stinson argues that

[16] Arguably, without the admission of the bite mark evidence, the state's case against Stinson may not have been sufficient to convict him. However, since we have already held that the bite mark

based on this lack of direct evidence of his guilt the jury verdict should be overturned. We disagree.

■

A finding of guilty may rest upon evidence that is entirely circumstantial.[17] This evidence must be sufficiently strong and convincing to establish the facts beyond a reasonable doubt in the mind of the trier of fact.[18]

■

In reviewing the record to determine if there was sufficient evidence to warrant a conviction, this court must consider the evidence in a manner that is most favorable to the state.[19]

> The test is not whether this court is convinced of the defendant's guilt beyond a reasonable doubt, but whether this court can conclude that the trier of fact could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true. Reversal is only required when the evidence considered most favorably to the state and the conviction is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt."[20]

---

evidence was admissible, we must review the entire record, including the bite mark testimony, in determining if the evidence was sufficient to support the jury verdict convicting Stinson of first-degree murder.

[17] *State v. Wyss*, 124 Wis. 2d 681, 692, 370 N.W.2d 745, 751 (1985).

[18] *Id.*

[19] *Id.* at 693, 370 N.W.2d at 751.

[20] *Id.* (citation omitted).

■ When the conviction is based solely upon circumstantial evidence, it must be upheld if a reasonable trier of fact could be convinced that the evidence is strong enough to exclude to a moral certainty every reasonable hypothesis of innocence.[21] The credibility of the witnesses and the weight of the evidence is exclusively for the trier of fact.[22]

■ After reviewing the record, we conclude that the evidence presented was sufficient to convince the jury, to a moral certainty, that there was no reasonable hypothesis of Stinson's innocence. Therefore, the evidence was sufficient to convince a reasonable jury beyond a reasonable doubt that Stinson was guilty of first-degree murder. The following facts support our conclusion.

Cychosz's body was discovered in the backyard of Stinson's residence. A medical examiner testified that she died between midnight and 2 a.m. In his testimony at trial Stinson admitted he was at the scene of the murder during this time period. This testimony, however, was inconsistent with the first statement Stinson made to the police. When Stinson was originally questioned on November 6, 1984, he told the police that on November 2, he returned home from a party around 11 p.m., went to bed, and heard nothing until he was awakened around 9 a.m. the next morning by the police in his backyard. When he was arrested in January, however, Stinson made a second statement which was considerably different from his first statement.

---

[21] *Id.* at 694, 370 N.W.2d at 751.
[22] *Id.*

In his second statement, Stinson told the police that after he arrived home from a party at 11 p.m. on November 2, he went to bed. He then added that he was awakened at 1 a.m. when a friend, Darin Lloyd (Lloyd), came to his house and asked if he would accompany him to a local store. Stinson agreed and the two exited Stinson's house and walked through the backyard. Stinson stated that as they walked through the yard he heard footsteps and wrestling sounds coming from the direction of the alley. Stinson said he did not see anyone in the area and he paid no attention to the noise. After returning from the store, he stated he went straight to bed.

At trial, however, Lloyd testified he called Stinson's home around 3 a.m. on November 3, 1984, and asked Stinson to accompany him to the store. According to Lloyd, Stinson came over to his house and they walked to the store from there. Lloyd stated that he did not go to Stinson's house, nor did the two of them walk through any alleys or backyards.

As was previously discussed, the jury also heard from two expert witnesses who testified to a reasonable degree of scientific certainty that the multiple bite marks found on the victim's body had been inflicted at or near the time of death. The experts also concluded that Stinson was the only person who could have inflicted the bite marks on the victim.

The jury heard testimony from Dr. Johnson, who first examined the victim on November 3, 1984. As he examined the victim, Dr. Johnson discovered multiple bite marks located on the victim's body. Dr. Johnson stated that the availability of bite marks from different parts of the body eliminated the possibility that the impressions obtained may have been distorted. He also

testified as to the methods used in preserving and comparing the bite mark evidence gathered.

A total of fourteen upper and lower jaw impressions were made from the bite marks found on Cychosz's body. Because of the opportunity to examine so many bites, and the fact that some of the bites were so deep as to be three-dimensional, Dr. Johnson testified he was able to detect a repetition of some particularly unique features in several of the bites.

Dr. Johnson later performed a forensic odontological examination of Stinson. Following the examination, Dr. Johnson noted the following unique features: one of the central incisors was fractured and decayed almost to the gum line; the lateral incisor in the upper jaw was set back from the other teeth; all of the upper front teeth were flared; the lower right lateral incisor was worn to a pointed edge; the right incisor was set out from the other teeth on the lower jaw. Dr. Johnson used these features along with the arch of the mouth and the spacing, width, and alignment of the teeth to make comparisons with the bite marks found on the victim. After an exhaustive examination of the photos, models and tissue samples taken from Stinson and the victim, Dr. Johnson concluded, to a reasonable degree of scientific certainty, that the bite marks on the victim were made by Stinson.

The jury also heard from Dr. Rawson who concluded, based on the workup Dr. Johnson performed on both the victim and Stinson, that Stinson had inflicted the bite marks on the victim. In Dr. Rawson's opinion the evidence in the case was overwhelming and he stated that "if we have four or five teeth that we are able to examine, then we can say that there is no other set of dentition like that." In this case, Dr. Johnson was able

to identify seventy-five individual tooth marks in various combinations of between five and eleven teeth.

Based upon this evidence, we hold that a jury could reasonably conclude beyond a reasonable doubt that Stinson murdered Cychosz. The reliability of the bite mark evidence in this case was sufficient to exclude to a moral certainty every reasonable hypothesis of innocence.

## CLOSING ARGUMENT

Stinson next argues that the trial court's ruling prohibiting defense counsel in closing argument from using a statement from an article the state had introduced into evidence constituted plain and reversible error.[23] The particular statement the defense intended to use appeared in the article's introduction, and referred to the disagreement among experts as to the admissibility and reliability of bite mark evidence.[24] Defense counsel argued that he should be able to use the statement because the article in which the statement appeared had been introduced into evidence. The trial court disagreed, stating:

---

[23] The article defense counsel sought to use was: Rawson, Ommen, Kinard, Johnson and Yfantis, *Statistical Evidence for the Individuality of the Human Dentition*, 29 J. Forensic Sci., 245, 245 (Jan. 1984). One of the article's authors, Dr. Raymond D. Rawson, was called by the state as an expert witness.

[24] The defense sought to use the following statement: "It was recently suggested that bite mark evidence should be excluded from the courtroom because of the lack of scientific reliability and the highly prejudicial nature of the evidence." *Id.* at 245. This statement footnoted another article not introduced into evidence, *see* Note, *supra* note 1, at 323, and whose author did not testify at trial.

It seems to me that what we are going to be doing is going off on a tangent on something that was never submitted to the jury during the course of the trial. There was no testimony to this effect. Granted this article has been received into evidence, and there was no objection; but to allow the defense to start reading this article and picking sentences out of this article line-by-line, and to have the state having to read the other part of the article and make arguments to it I think would unduly confuse the issues and confuse the jury.

To include a sentence that [h]as recently suggested that bite mark evidence should be excluded from the courtroom, a footnote for that particular quote, is from apparently a law review article from Southern California in 1978 which is not in evidence in this case, this was not a finding of this doctor, it was simply a comment upon another article, and so I am going to prohibit the defense from arguing that particular point during closing.

■

While counsel has wide latitude in closing argument, the control of the content of the argument is within the sound discretion of the trial court. Reversal will not be granted unless there is an abuse of discretion that was likely to have affected the jury's verdict.[25]

■

After a careful review of the record, we conclude that the trial court did not abuse its discretion in limiting the content of defense counsel's argument. Stinson contends that the trial court's ruling "slammed the door" on his attempt to "fully explore the ramifications"

---

[25] *State v. Lenarchick*, 74 Wis. 2d 425, 457, 247 N.W.2d 80, 97 (1976).

of the evidence introduced by the state. A review of the record, however, reveals that counsel had an opportunity to "explore the ramifications" of the evidence introduced when Dr. Rawson, one of the article's authors, testified as an expert witness for the state. The defense never cross-examined Dr. Rawson concerning the statement in the article. Nor did the defense call any experts of their own to testify as to the disagreement among experts concerning the scientific reliability of bite mark evidence. In addition, the trial court properly concluded that because the article's statement referred to a law review article which was not in evidence, the statement could not be used as a basis for arguing that bite mark evidence was unreliable. Therefore, we conclude that the trial court did not err on this issue.

## DISCHARGE OF DEFENSE COUNSEL

On the second day of trial, Stinson informed the trial court that he wanted a new attorney. Stinson had prepared a written statement which set forth the reasons for the request.[26] Stinson argued that because

---

[26] The following statement, prepared by Stinson, was read into the record by the trial court:

THE COURT: I would like to move the Court, with all due respect, for new counselor for the following reasons.

One, I fill, I assume he means feel, my counselor has been misrepresenting in my case due to the fact that there are quite a lot of facts, important facts, that he has not brought out on cross-examination.

I feel he is ill counseling me to the degree that he only took my case two weeks ago. There was not enough time for him to have prepared for a trial in my best defense.

Three, we have a personality conflict and cannot come to any agreement on anything.

attorney Steven Kohn (Kohn) had only been on the case for two weeks, he did not have enough time to become familiar with the case and prepare an adequate defense. In addition, Stinson claimed he had a personality conflict with his attorney which prevented them from reaching any agreement as to how to proceed on the case.

In his defense, Kohn argued that while it was true that he had only been on the case for two weeks, his law partner was the attorney originally assigned to the case. Kohn stated that he had discussed the case with his partner since the case had come into their office, that he was fully aware of the facts of the case, that he had gone over all of the statements of the witnesses with his partner, and that he and his partner had met Stinson prior to Kohn's taking the case. Kohn also pointed out that when he and his partner had met to discuss the change in attorneys with Stinson, Stinson stated that he had no problem with Kohn becoming his counsel. Stinson also made no objection when substitution of counsel was made in court.

The trial court denied Stinson's request for new counsel because

> [t]o grant that kind of a request in the middle of a jury trial, in my opinion, would only be justified if there was very good cause shown, and I'm not satisifed that there is very good cause shown. Obviously, I do not know what's been occurring between

---

Your Honor, I'm facing life for something I did not commit. I feel I should be given a counselor with whom I can work with and discuss my case in full details, and I'm asking for is the fulfillment of my First and Second Amendment Constitutional rights. With respect to the Court, I am asking for new counselor, so please let the record reflect my doing so at this time. Thank you.

you and your counsel outside the courtroom. I know I have observed your counsel, and from at least my standpoint, he is doing a very competent and excellent job of representing you. I suggest you sit down with him and discuss your concerns with him. If you want him to ask questions of the witnesses, then you discuss that matter with him, but I am not going to grant you the right to have new counsel at this point because clearly no lawyer could come in and represent you during the middle of a jury trial.

Stinson now argues that the trial court's ruling constituted prejudicial and reversible error. We disagree.

The question of whether an appointed counsel should be relieved and another attorney substituted in his place is one which lies within the province of the trial court's discretion.[27] A showing of good cause is required to warrant substitution of appointed counsel.[28] "[W]hen the moment of trial has arrived and the witnesses are present, the trial court has the right and duty to weigh the impact of a requested adjournment on other persons involved in determining whether defense counsel should be substituted . . . ."[29]

The trial court in this case did weigh the impact of Stinson's request and reasonably concluded, based on the facts presented by both Stinson and his attorney, that Stinson's request should be denied. Therefore, we

---

[27] *State v. Haynes*, 118 Wis. 2d 21, 27, 345 N.W.2d 892, 896 (Ct. App. 1984).

[28] *Id.*

[29] *State v. Scarbrough*, 55 Wis. 2d 181, 187, 197 N.W.2d 790, 793 (1972) (citation omitted).

conclude that the trial court did not abuse its discretion in refusing Stinson's request for substitution of counsel.

*By the Court.*—Judgment affirmed.