STATE OF WEST VIRGINIA

*v.*

THOMAS V. CRAFT

(No. 9966)

Submitted January 20, 1948. Decided March 2, 1948.

*Herbert M. Blair,* and *Wm. Bruce Hoff,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, and *J. Chandler Curd,* Assistant Attorney General, for defendant in error.

KENNA, JUDGE:

Thomas V. Craft was indicted in the Circuit Court of Lewis County for malicious assault in violation of the provisions of Code, 61-2-9, upon Andrew Holt on the _____ day of October, 1944, being accused and acquitted of malicious and unlawful assault but convicted of assault and battery, fined $100.00 and costs, and sentenced to thirty days in the Lewis County jail, this Court awarding a writ of error and supersedeas upon petition of the accused on the 19th day of June, 1947. Since one of the principal assignments of error rests upon the insufficiency of the State's evidence and quite a number of assignments turn upon evidential questions, it is necessary to go, in some detail, into the circumstances disclosed by this record.

On the night of October 26, 1944, at about ten o'clock, the accused, Thomas V. Craft, who was then a police officer of the City of Weston, accompanied by one Asa Posey, another officer, was cruising in the police department's patrol car on Main Avenue of that city. When they reached a point near the building occupied by the Weston Democrat they observed Andrew Holt, accompanied by one Clay Westfall, staggering on the sidewalk. Andrew Holt had been arrested and convicted several times for being intoxicated in a public place in the City of Weston over a period of years. Correctly concluding that Holt was drunk, they stopped in front of a taxi stand, got out, and arrested him.

The validity of the arrest was not questioned in the trial court and, consequently, is not being considered here. As a result of the head injury later received by Andrew Holt he stated that he had absolutely no memory of occurrences after he got into the police patrol car on the evening of October 26 until he recovered consciousness in the Weston Hospital the following afternoon.

The place of arrest was within about one hundred feet of the home of Andrew Holt's mother, where he lived, and according to the testimony of both Craft and Posey they saw no persons other than Holt and Clay Westfall when the arrest was made. Upon being told that he was under arrest and to get in the back seat of the police car, Holt hesitated but reluctantly complied, sitting on the left side of the back seat directly behind Craft, with Posey on his right. Craft drove. Both Craft and Posey were carrying maces or night sticks. According to their testimony, Holt began cursing Craft when he got into the car. Craft drove the car through Democrat Alley to Water Street and as the automobile approached the intersection of Water and Second Streets Holt, continuing to curse, became violent, striking Craft on the back of the head with his fist and, with Posey attempting to interfere, Holt threw one arm around Craft's neck attempting to pull him over the front seat. Craft stopped the car. His night stick was on the seat beside him and in order to release his neck he took the mace in his right hand and struck Holt's arm. That seems to have concluded the violence in the automobile.

When the patrol car reached the city building Holt was taken by Craft and Posey to a room used as police headquarters and evidently for other purposes as well. As they were going through the door of the street entrance, Craft says that Holt called him an Irish son-of-a-bitch who had been wanting to club him for a long time and that then was when he would have to do so. Since the doorway of the corridor upon which the two cells of the city jail fronted was across the room of police headquarters from its street entrance, Craft says he merely gave Holt a "light tap" on the back of the neck

and shoved him forward. When the three reached the steps leading from the floor of police headquarters to the corridor upon which the cells fronted Posey appears to have been in the lead, followed by Holt. At any rate, at or near the bottom of the three steps Holt "jerked loose" from Craft and Posey and swung viciously at Craft. Craft avoided the blow, warding it off with the same arm in the hand of which he carried his night stick, striking Holt a light blow on the shoulder. Asa Posey, deeming it necessary to subdue Holt, struck him on top of his head with his night stick powerfully enough to knock him to the floor, but not render him unconscious. Holt continued to resist the efforts of the officers after he was on the floor, attempting to kick them and resisting their efforts to stand him on his feet. Craft says the he struck Holt's legs several times with his mace in order to end his resistance. After they had gotten Holt into the first cell, where they remained with him for several minutes, they came back to police headquarters and someone mopped up a puddle of blood on the floor in the neighborhood of where Holt's head rested when he fell from Posey's blow.

In police headquarters when Holt was brought there were Desk Sergeant Lewis, Homer Golden, and W. E. Timms, the latter two being visitors and business men of the neighborhood. Their testimony in chief practically corroborates that of Craft and Posey. However, the State was permitted to show that Golden had testified before the grand jury stating in substance that both Craft and Posey had struck Holt with their maces on the head as they were entering the cell corridor, the blows being simultaneous. Golden and Timms both left police headquarters while Holt was being placed in the cell. The testimony of Craft, Posey, and Desk Sergeant Lewis is that after Holt was locked in the cell he continued to protest profanely, demanding release and rattling the bars of his cell for several minutes. Craft stated that he did not strike Holt a violent blow on the head with his mace. Posey testified that he struck only the one blow.

Matthew Holt, a witness for the State, who lived with his mother, testified that while downtown with his son

between ten and eleven on the evening of October 26 he was informed that his brother Andrew was in the city jail, having been arrested and beaten to a pulp by a policeman. Having his small son with him, he went home. He first tried to reach his brother, Rush D. Holt, on the telephone. Being told that his brother had left his home, he went to the bathroom on the second floor to change clothes. While he was changing, his brother, Rush, came upstairs, told him of a telephone message concerning Andrew's arrest that he had received, and started with him to police headquarters. Upon arriving at police headquarters Matthew Holt did not go in, but left the car and went across the street to talk with one Bid Radcliff. Rush D. Holt went into headquarters and returned in a few moments informing Matthew that permission to see their brother was denied. They then went to the home of John Perkey, Mayor of Weston. After discussing the matter with Mayor Perkey, the Mayor called a Doctor Lawson whom he asked to go at once to the city jail to examine Andrew Holt and, if he found it necessary, take him to the hospital. He told Matthew and Rush D. Holt to inform the city jailer that they had his, the Mayor's, permission to see their brother. Under that arrangement they returned to police headquarters.

Rush D. Holt testified that he had received a telephone call at his home informing him that his brother Andrew had been arrested and beaten by Mr. Craft. The call was from a woman who spoke in an extremely excited tone and refused to give her name. He then went to his mother's home where he met his brother Matthew, followed by the occurrences already stated.

When Matthew and Rush D. Holt returned to the city jail and announced that the Mayor had given them permission to see their brother Andrew they were admitted to his cell by Posey. They state that they found their brother on the floor leaning against a bench used for a seat. He was sitting in a shallow pool of blood estimated to contain between one pint and one quart and covering an area approximately four feet in diameter. His head was bloody and bowed and he was altogether uncon-

scious. They had been in the cell but a few minutes when Doctor Lawson arrived, superficially examined Andrew Holt and concluded that he must go at once to the hospital. Doctor Lawson states that he was in a dazed condition. He stood him on his feet and, with support and help, Andrew walked to the doctor's automobile and was taken to the Weston Hospital. There Doctor Lawson examined his wound, stitched it without an anesthetic, stating that Holt was not conscious of pain, and bandaged his head. He was then put to bed in a downstairs room containing three or four additional beds.

The wound or wounds that Doctor Lawson found on Andrew Holt's head he described as two scalp wounds baring the skull, the one extending back from approximately the forehead hairline a distance of three and one quarter inches and the other crossing the first at right angles for approximately an inch and a half. Both were approximately one-half inch wide. X-rays were taken on November 10 disclosing a fractured skull, resulting in no displacement, and a small triangularly shaped white area indicating a blood clot, in Doctor Lawson's opinion.

Around daybreak on the morning of October 27 Andrew Holt evidently tore the bandages off his head and in some unknown manner left the hospital. His brother Matthew got up around six o'clock, went into the back yard and found Andrew in the alley. He states that he promptly took him back to the hospital. However, early the same morning one of the nurses at the hospital called Mrs. Holt at her home and was informed that Andrew was at home in bed and resting. He was sent back to the hospital when he awoke. It does not clearly appear whether he left the hospital twice, or whether the testimony is two different versions of the same occurrence. Later on the twenty-seventh Holt and a man by the name of Weese, from Gassaway, who was another occupant of the downstairs room, drank two quarts of wine and sent out and procured more which they also drank. Their attempt to get a third supply was frustrated by one of the nurses.

Going back to the time of the arrest: Mrs. Elizabeth Jones, who testified on behalf of the State, stated that she saw Craft leave the car, grab Andrew Holt, whirl him around, place handcuffs on him and put him in the police car. She ran from there to the police station where she saw Andrew Holt on the floor handcuffed with Posey holding his feet and Thomas Craft beating him on the head with a club or mace. Finally Posey and Craft took him by the arm and dragged him through a puddle of blood to the cell. The detail of Mrs. Jones' testimony is without corroboration.

When the evidence of the defendant was concluded the court permitted the State to put on, by way of rebuttal, the testimony of three women in contradiction of that of Craft and Posey that they saw no persons "when the arrest was being made". These three women testified that after the store in which they worked had closed at nine-thirty and while on their way home from a hot dog stand, they saw the arrest made. The defendant objected to the testimony of these three women because they were permitted not only to say that they were close to the place of the arrest and had an opportunity to observe it in contradiction to the testimony of the defense witness, but were allowed to testify in detail concerning the circumstances of the arrest and that Andrew Holt was not noisy nor in any other way conducting himself in an objectionable manner.

The plaintiff in error complains because the trial court refused to direct the jury to return a verdict in his favor. His motion below is based upon the contention that there is no direct nor circumstantial evidence that Thomas Craft struck Andrew Holt a violent blow on the head that might have caused or contributed to his physical condition as testified to by Doctor Lawson and that justified the jury in finding that excessive force was used by Craft in effecting, and requiring Holt to submit to, arrest. Craft took Holt into custody and made his arrest, although Posey was present and assisting. The primary responsibility for Holt's safety rested upon Craft, and the

conduct of the two officers indicates quite plainly that Craft was in control and that Posey considered himself subject to Craft's orders, as did Craft. The evidence shows quite clearly that Craft and Posey were the only persons who were within striking distance of Andrew Holt from the time of his arrest on Main Avenue until his two brothers saw him in the cell a few minutes before Doctor Lawson's arrival. There is evidence indicating that during that period Holt was struck twice on the head with an officer's mace, resulting in two scalp wounds both reaching the skull at approximately the same location. This the jury could have believed. Posey admits inflicting one of these wounds: both he and Craft deny inflicting the other. Under the circumstances shown, the jury could have disbelieved either denial. Since it is a practical certainty that one of the two, both of whom were on the witness stand, is worthy of belief in his denial, it seems quite clear that the question was for the jury. This viewpoint, of course, considers the testimony in its entirety. Considering only that of the State in chief, however, the testimony of Mrs. Elizabeth Jones to the effect that she saw Craft strike Holt repeatedly in the head while Holt was on the floor at police headquarters, unquestionably was sufficient to carry the case to the jury upon the conclusion of the State's testimony. It is to be doubted whether, at any time, the court would have been justified in instructing the jury to disbelieve the testimony of this witness. We are of the opinion that there was sufficient circumstantial evidence to connect Craft with the alleged assault.

A number of the thirty-eight grounds of assigned error are based upon either the offense of malicious wounding or unlawful wounding under Code, 61-2-9. Since the conviction was for the lesser offense of assault and battery these assignments will not be discussed because under our holdings possible errors relating only to an offense greater than that of which the accused has been convicted are nonprejudicial upon writ of error under sentence for the lesser offense. *State* v. *Zannino,* 129 W. Va. 775, 41 S. E. 2d 641, 644; *State* v. *Barker,* 128 W. Va. 744,

38 S. E. 2d 346; *State* v. *Bowles*, 117 W. Va. 217, 185 S. E. 205.

Of course it is not possible to discuss all the remaining assignments of error. However, each has been examined and we shall attempt to make clear our conclusion concerning those that we consider of consequence.

Andrew E. Holt, the victim of the alleged assault, was the first witness for the State. Under cross-examination he was asked if he did not harbor ill will toward the defendant, Thomas Craft. His answer was: "Yes, of course, and when he killed Jesse Sturms that made it worse." Counsel for the defendant immediately moved to strike so far as the reply related to the killing of Jesse Sturms. That motion was granted. The motion to strike was followed by the defendant's motion to declare a mistrial. After a rather lengthy hearing in chambers, which included the examination of Andrew Holt, and after having "polled" the jury on the question of whether the reply of the witness would affect their verdict and having received a negative response from each individual member of the jury, the motion was overruled, the defense not asking the court to instruct the jury that the witness' reply was untrue nor attempting to make a collateral issue concerning it although the hearing in chambers did disclose that Craft did not kill Jesse Sturms.

In our opinion, under all the circumstances surrounding this question, the defendant, before the objectionable matter was stricken from the record on his motion, would have been entitled to have the jury instructed that the statement of Andrew Holt was untrue, in which case it could have resulted in no prejudice to the defendant Craft. This method of dealing with the matter was discussed in chambers, the court indicating that it would not so instruct the jury. However, the matter was not put in the form of a timely motion nor otherwise raised in a manner that would enable us to rule upon that specific question here. To hold that it was error not to tell the jury that a statement that it had been instructed, on motion of the defendant, to disregard, was false, would

certainly be at least incongruous. If stricken, the question of its truth does not arise. The statement of Holt concerning the killing of Sturms was entirely voluntary and to hold that it was error not to direct a mistrial on account of the irrelevant interjection of a witness, would place in the hands of a single witness the power to prevent a conviction. As to the defendant standing upon his overruled motion for a mistrial due to the court's "polling" the jury, we can say only that in our judgment the defendant's objection, based upon the likelihood that polling the jury directed undue attention to the witness' reply and overemphasized its possible consequence, is hardly consistent. It was the defendant's motion upon a matter that would necessarily be considered in chambers and the fact that, pursuant to that motion, a considerable part of one morning was spent in interrupting the progress of the trial resulted from that motion. In the opinion of the trial judge that procedure necessitated the "polling" of the jury in order to ascertain the effect of Holt's answer. We doubt that this was required but certainly it was not improper. There are a number of other questions upon which courts are required to poll juries, the answers to questions being determinative of the validity of the jury's verdict. In addition, in the course of the procedure the trial court offered to declare a mistrial provided the case be set for trial on the following Monday and not continued to the next term. This was declined by counsel for the accused. The question of directing a mistrial rests in the sound discretion of the trial court and we can here see no abuse of that discretion.

Complaint is made that upon the conclusion of the accused's testimony in the court below the State was permitted to introduce testimony the effect of at least part of which was to corroborate the State's evidence in chief. As to the order of proof, the contention of the plaintiff in error we believe is well taken, but we are of the opinion that it does not constitute reversible error to admit as rebuttal testimony that which should have been part of the case in chief, if adequate opportunity is given the opposing side to meet the additional testimony.

Of course the order of proof is largely discretionary and if new matter were permitted to be introduced by way of rebuttal which showed a plain abuse of that discretion it would constitute reversible error. Here we think that situation does not exist.

State's instruction No. 8 attempting to throw light upon the meaning of "reasonable doubt" we believe was non-prejudicial. This Court has often said that the phrase "reasonable doubt" from the standpoint of simplification is indefinable. However, this Court has not yet held that an attempted definition constitutes reversible error and should not so hold until, by reason of peculiar circumstances or phraseology, it can be said that such an instruction would mislead or confuse a jury. Here, in our opinion, it did neither.

State's instruction No. 9 was the so-called "deadlock-breaking" instruction, the State taking the position that the giving of the instruction was justified by the case of *State* v. *Koski,* 100 W. Va. 98, 130 S. E. 100, and the plaintiff in error contending that it was not. The instruction reads as follows:

> "The Court instructs the jury that no juror should yield a conscientious opinion deliberately formed after a full and fair investigation of the case, and the jury is further instructed that the jury room is no place for pride of opinion or stubbornness, but that it is the duty of the jurors to discuss the evidence in a spirit of fairness and candor and with each other and with open minds, and to give careful consideration to the views of their fellows, and if it can be done without sacrifice of conscientious convictions, agree upon a verdict."

Disregarding the *Koski* case, we do not believe that the giving of the instruction is prejudicial error though its giving undoubtedly paves the way for the so-called "hanging" instruction. Both, we believe, are unduly flavored with moralizing rather than undertaking to enlighten the jury upon the applicable law. We see no reversible error in this assignment.

Defendant's instruction 1-C, which was refused, would have told the jury that if they believed from the evidence that the blows that injured the prosecuting witness, Andrew Holt, were struck by Asa Posey and not by Thomas V. Craft, they should find for the defendant. We believe that the refusal of this instruction was not reversible error for the reason that Asa Posey was not on trial and therefore the jury could not be asked to actually find from the evidence that the blows in question were struck by him, the issue being whether a blow which contributed materially to Hölt's injury had been struck by the accused. The correct substance of this instruction was adequately covered by the twenty odd instructions given on behalf of the accused.

The plaintiff in error contends that there is an inconsistency in State's instruction No. 5 and defendant's instruction No. 29, both dealing with the general rule relating to the weight to be given the testimony of a witness. We do not deem it necessary to discuss these instructions in detail. They have been carefully compared. We are of the opinion that there is no conflict that would materially affect the jury's conclusion and certainly none that would prejudice the accused.

Defendant's instruction 1-F, as offered, was to the effect that the blow or blows that injured Andrew Holt were justified only "in order to effectuate the arrest and imprisonment" of Holt. The trial court struck out the words "and imprisonment" so that the instruction turned upon the arrest only. The plaintiff in error contends that the arrest was completed when Andrew Holt was taken into custody on Main Avenue and that the words "and imprisonment" are necessary in order to cover the period between that time and the time of his actual incarceration and several minutes thereafter. We believe that the substance of this instruction also was covered by others given on behalf of the accused and furthermore that the word "arrest", in this sense, includes the time that the accused was in the manual custody of the arresting officer. We see no error in the court's modification of this instruction.

We have examined each of the instructions given on behalf of the State as well as the instructions offered and refused on behalf of the defendant. The court gave twenty-three instructions on behalf of the defendant and twelve instructions on behalf of the State. We find no reversible error in the instructions given on behalf of the State and none refusing defendant's instructions. The purpose of instructions is to clarify in the minds of a lay jury the governing principles of law applicable to the case at bar. They are not for the purpose of testing the knowledge of the trial court. Abstract instructions are not favored and duplicate instructions dealing with substantially the same subject matter should not be given. While we cannot, within the scope of this opinion, discuss each instruction given for the State and refused on behalf of the defendant, we can say that there is no error perceived. As we have said, a number of the instructions of the accused were related to malicious assault and to unlawful assault, both felonies under Code, 61-2-9. Since the verdict was for the less offense of assault and battery, these instructions have not been considered.

The plaintiff in error contends that the trial court erred in declining to grant the motion of the accused to set aside the verdict and grant him a new trial because no conviction for assault and battery can be upheld under an indictment for a violation of the provisions of Code, 61-2-9, assault and battery not being included in the provisions of Code, 62-3-16, contended by the plaintiffs in error to be the applicable statutory provision. Conceding that this question was properly raised before the trial court, which we think is extremely doubtful, the contention of the plaintiff in error lacks merit because of the provisions of Code, 62-3-14, this Court having held in *State* v. *Smith*, 130 W. Va. 183, 43 S. E. 2d 802, that under an indictment charging a felony under the provisions of Code, 61-2-9, a verdict for the misdemeanor of simple assault may be sustained.

It is contended that the testimony of Rush D. Holt concerning the telephone call received by him at his home informing him that Andrew Holt had been arrested and

assaulted by Mr. Craft was hearsay that was erroneously admitted over the objection of the accused. The State contends that the testimony was admissible as a part of the *res gestae* occurring immediately after the arrest and while the unidentified informant was obviously excited. While we are not of the opinion that the testimony would justify the use of this telephone conversation as proof of the alleged facts stated therein because a part of the *res gestae,* we yet ·believe that it was not error to admit it under a general objection. The telephone conversation was the reason for the course of conduct pursued by Rush D. Holt. Something actuated him to go to the city jail accompanied by his brother Matthew. We think it is plainly proper that the jury know his purpose and why it was formed. If counsel for the accused had moved to restrict the consideration of the jury of the testimony in question to the reasons for Rush D. Holt's course of conduct and not the truth of the report upon which he acted, the jury should have been so instructed. Under the circumstances there was no error in the trial court's refusal to strike the testimony.

Error is assigned to the fact that Craft, who testified during the time that he was on duty as a policeman, and while in uniform and armed, was, at the request of counsel for the State, disarmed while on the witness stand. Although the question was properly raised by objection and exception at the time, it was not proffered as a reason to set aside the verdict or in any other manner pointed out to the trial court as reversible error. However, the question is one which we think is entirely discretionary and certainly it would require unusual circumstances to make the disarming of a witness while on the stand reversible error. Such circumstances do not here exist.

For the foregoing reasons the judgment of the Circuit Court of Lewis County is affirmed.

*Affirmed.*