369 S.E.2d 870

**STATE of West Virginia**

v.

**Keith ARMSTRONG.**

No. 17614.

Supreme Court of Appeals of West Virginia.

April 22, 1988.

John A. Rollins, Lewis, Ciccarello & Friedberg, Rebecca A. Betts, King, Betts & Allen, Charleston, for Keith Armstrong.

Silas Taylor, Deputy Atty. Gen., Charleston, for State of W. Va.

McHUGH, Chief Justice:

This case is before this Court upon the appeal of Keith Armstrong, the appellant and defendant below, from a conviction of aggravated robbery in the Circuit Court of Kanawha County, West Virginia. Having reviewed the petition for appeal, all matters of record, including exhibits, and the briefs and oral argument of counsel, we find no reversible error and affirm the judgment of conviction.

I

In the early morning, pre-dawn hours of March 21, 1985, the assistant manager of the Fifth Quarter Restaurant in Charleston, West Virginia, Harold James, and a temporary cleaning man, Larry Summey, were confronted inside the restaurant by an individual wearing two ski masks and armed with a handgun. The gunman, in an obviously muffled voice, directed Mr. James to open the safe. The robber spoke little and indicated his directions mostly with gestures. Apparently familiar with the many keys and the layout of the restaurant, he then placed Mr. James and Mr. Summey in the meat locker and took approximately $7,800 from the safe inside the manager's office, the door to which had previously been locked. The robber then located the switch panel and turned off all the outside lights.

About twenty minutes later, Mr. James and Mr. Summey opened the locker from the inside by releasing an emergency mechanism and contacted the police after determining the gunman was gone.

Later that morning, shortly after the police had left the scene, Mr. James found a wet paper towel in the restaurant's trash can below the cashier's stand. The paper towel was on top of the trash and appeared to have been chewed. Mr. James contacted the police, who gave the paper towel to the State Medical Examiner, Dr. Irvin M. Sopher. Dr. Sopher, who has doctorate degrees and experience in both medicine and dentistry, made casts of what appeared to be teeth impressions on the paper towel.

Mr. James and Mr. Summey described the gunman's clothing as including blue jeans with bleach spots down one leg, and stated the gunman was approximately six feet tall with a medium build. Mr. James further testified that he saw the color around the gunman's eyes and identified him as a black man.[1]

According to Mr. James and Mr. Summey, the gun the robber was carrying had a cherry colored handle and was the size of a .357 magnum. Mr. James stated that prior to the robbery he had seen the same type of gun in the possession of Lonnie McClanahan, an employee of the restaurant. Mr. McClanahan testified that he had purchased a .357 magnum, with a cherry colored grip, from the appellant in October or November of 1984, and had loaned the gun to the appellant about eleven days prior to the robbery. The appellant stated he had borrowed the gun for a weekend camping trip. Mr. McClanahan further

---

1. Although the appellant at that time had a cataract in his left eye which was observable in normal light, neither Mr. James nor Mr. Summey testified that the gunman possessed such a characteristic. The interior of the restaurant was dimly lit at the time of the robbery.

stated that the appellant never returned the gun to him.[2]

About a month prior to the robbery the appellant had been discharged from his employment as a kitchen worker for the Fifth Quarter Restaurant. Ivan Lee, who had worked with the appellant at the restaurant, testified in rebuttal to the appellant's alibi defense that the appellant told him, Mr. Lee, four to five days before the robbery at the restaurant that he, the appellant, would "like to knock it over for the bad things they done [sic] to me."

Upon the motion of the Prosecuting Attorney for Kanawha County, West Virginia, the Circuit Court of Kanawha County ("the trial court") authorized casts of the appellant's teeth to be made, for the purpose of comparison with the casts of the teeth impressions taken from the wet paper towel found in the restaurant's trash can.

At trial the State established that Dr. Sopher, in addition to being a qualified forensic pathologist, was, based upon his training and experience, qualified to give testimony as an expert witness in the field of forensic dentistry, also known as forensic odontology. Dr. Sopher had, *inter alia*, authored a leading book in the field of forensic odontology, entitled *Forensic Dentistry*, published in 1976.[3] Dr. Sopher testified that bite-mark comparisons were accepted, reliable techniques and that he had been involved as an expert witness in about thirty to forty criminal cases nationwide involving bite-mark comparisons. In those cases he had been called overall by the defendant almost as frequently as by the prosecution.

In this case Dr. Sopher testified that he had utilized two of the accepted comparison techniques. First, he visually compared the wax bite impressions taken from the casts of the appellant's teeth with the casts of the teeth impressions taken from the paper towel. Second, he compared, in overlay fashion, the enlarged photographic negatives of the appellant's teeth impressions with the enlarged photographic negatives of the teeth impressions on the paper towel. His analysis in this case disclosed that there were eight upper front teeth and seven lower front teeth impressions on the paper towel, a large number of teeth impressions for bite-mark comparisons because most bites are by front, not rear, teeth. The paper towel made an excellent medium for registering and preserving teeth impressions, much better than in any other bite-mark case in which Dr. Sopher had been involved.

While showing the jury the bite-mark evidence, Dr. Sopher testified that each person's teeth structure and alignment are unique; that the appellant's teeth were irregularly aligned and several were crooked, and that such irregularity facilitates confirmation of the match between a suspect's teeth and a bite mark; and that an examination of each tooth indicates an exact, perfect match between the appellant's teeth and the bite-mark pattern on the paper towel, with no incompatibility. Dr. Sopher therefore concluded with a reasonable degree of dental certainty that "the bite-mark pattern in the towel is that of the teeth of Keith Armstrong, to the exclusion of all other individuals."

2. Mr. James and Mr. Summey stated that the handle of the robber's gun was large and extended a good distance above a person's hand; therefore, according to Mr. Summey, the handle was what he would call a "custom grip." Mr. McClanahan testified that the gun which he purchased from the appellant had what he would call a standard grip for a .357 magnum. This description was corroborated by Maurice Reed, another employee of the restaurant, who had seen the gun purchased by Mr. McClanahan from the appellant. Mr. Reed described the gun as a "plain old .357 magnum" with a cherry colored grip. None of the witnesses demonstrated any particular expertise with respect to handguns. No gun was presented at trial.

3. Forensic dentistry, also known as forensic odontology, involves the application of the science of dentistry to legal problems. It is used primarily in two ways, specifically, first, to identify deceased persons by comparison of antemortem and postmortem dental records and, second, to identify a criminal defendant through a comparison of his or her dentition, that is, the kind, number and arrangement of the teeth, with bite marks found on objects or, more often, on the body of a victim of a homicide, sexual assault, child abuse, etc. Identification by dentition is premised upon the idea that each person's dentition is unique. *See* P. Giannelli and E. Imwinkelried, *Scientific Evidence* §§ 13–1 to 13–2 (1986).

The trial court had authorized the appellant to obtain the services of Dr. Lowell J. Levine, from the State of New York, another leading authority in the field of forensic dentistry. Dr. Levine examined Dr. Sopher's pretrial report on the bite-mark comparisons in this case. Although Dr. Levine was included in the appellant's list of potential witnesses at trial, the appellant did not call Dr. Levine or any other expert as a witness.

The appellant presented an alibi defense at trial. One of his neighbors testified that she observed that the appellant was at his apartment sometime between 11:00 p.m. and midnight on the evening before the robbery. This testimony tended to contradict the State's theory that the appellant, a former employee of the restaurant, had slipped unnoticed into the restaurant before the doors were closed at 11:30 p.m. and had hidden himself above the ceiling tiles in the men's room. The appellant's neighbor also testified, though, that the appellant had a separate outside entrance to his apartment and that she remembered seeing the appellant only briefly the one unspecified time between 11:00 p.m. and midnight. The appellant lived about two miles from the restaurant.

The jury returned a verdict of guilty. The trial court denied the appellant's motion for a new trial and subsequently sentenced the appellant to thirty years in the state penitentiary.

## II

### ADMISSIBILITY OF BITE-MARK EVIDENCE

The appellant did not challenge Dr. Sopher's qualifications as a forensic dentist and did not question the reliability of the bite-mark comparison techniques utilized in this particular case. The appellant did, however, move for an *in camera* hearing

for the State to establish the reliability and general acceptance by forensic dentists of bite-mark comparisons in general. The appellant sought a ruling that such an *in camera* hearing was a necessary predicate to allowing Dr. Sopher to testify as to such comparisons in this case. The trial court denied the appellant's motion for an *in camera* hearing on the ground that expert testimony as to such comparisons was admissible and the appellant could argue to the jury the weight to be given to such testimony.

The appellant assigns as error the trial court's denial of his motion for an *in camera* hearing on the admissibility of bite-mark evidence. We perceive no error in the trial court's ruling.

The appellant contends that *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980), involving hair analysis, requires a trial court to compel *"in camera* disclosure [by the State] of the [scientific] test results and methodology in order to make an initial determination of whether the expert's testimony should be admitted." *Id.* 165 W.Va. at 622, 270 S.E.2d at 678. As we explained in *State v. Wallace*, 175 W.Va. 658, 661, 337 S.E.2d 316, 319 (1985) (hair analysis), and in *State v. Wyant*, 174 W.Va. 567, 572, 328 S.E.2d 174, 179 (1985) (leuco-malachite green test to detect blood and hair analysis), *Clawson* does not require an *in camera* hearing for all scientific tests, but only for those not yet generally accepted in the particular scientific field. "There are certain scientific tests that have been widely used over a long period of time, such that their general acceptance in the scientific community can be judicially noticed." *Clawson* at syl. pt. 8. In contrast, "where the reliability of the scientific test cannot be judicially noticed, its reliability must be demonstrated before the expert can testify concerning the test[.]" *Id.*, 165 W.Va. at 618, 270 S.E.2d at 677.[4]

4. In syllabus point 7 of *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980), the Court held: "In order for a scientific test to be initially admissible, there must be general acceptance of the scientific principle which underlies the test." *Accord*, syl. pt. 1, *State v. Barker*, 179 W.Va. 194, 366 S.E.2d 642 (1988) (Horizontal Gaze Nystag-

mus test to estimate blood alcohol content). This standard for admissibility of scientific tests is derived from *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), where, in holding a systolic blood pressure deception test (polygraph test) to be inadmissible, the court stated: "[W]hile courts will go a long way in admitting expert

An example of a scientific test which this Court has judicially noticed as being generally reliable is identification of a criminal defendant by fingerprint comparison. *See* syl. pt. 4, *State v. Johnson,* 111 W.Va. 653, 164 S.E. 31 (1932). The Court concluded that judicial notice of the admissibility of fingerprint evidence was not precluded by the fact that the case presented a question of first impression for this Court or by the fact that error in identification by such evidence may sometimes result, as the latter goes to the weight, not to the admissibility, of the evidence. *Id.* 111 W.Va. at 658–59, 164 S.E. at 34. *See also State v. Clawson,* 165 W.Va. 588, 617, 270 S.E.2d 659, 676 (1980) (fact that scientific test is not completely infallible will not bar its admissibility).

■ This case presents a question of first impression for this Court, specifically, the admissibility of bite-mark evidence. *All* of the twenty-one jurisdictions which have specifically addressed this question in a reported opinion, where a qualified expert

was involved, have held bite-mark evidence to be admissible for positive identification purposes, and the general reliability of bite-mark comparison techniques has been sufficiently established, such that a hearing in each case to establish the general reliability thereof is not necessary. The courts have rejected challenges to bite-mark evidence based upon constitutional, evidentiary and scientific arguments. *See People v. Middleton,* 54 N.Y.2d 42, 429 N.E.2d 100, 444 N.Y.S.2d 581 (1981); *People v. Smith,* 110 Misc.2d 118, 443 N.Y.S.2d 551 (Dutchess County Ct.1981), *aff'd,* 63 N.Y.2d 41, 479 N.Y.S.2d 706, 468 N.E.2d 879 (1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); *State v. Peoples,* 227 Kan. 127, 605 P.2d 135 (1980); *State v. Sager,* 600 S.W.2d 541 (Mo.Ct.App.1980), *application to transfer denied* (Mo. July 15, 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); *Kennedy v. State,* 640 P.2d 971 (Okla.Crim.App. 1982); *Doyle v. State,* 159 Tex.Crim.R. 310, 263 S.W.2d 779 (1954) (burglary; bite mark

testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014.

*Clawson* was decided before the *West Virginia Rules of Evidence* became effective (on February 1, 1985) and *State v. Barker,* decided this year, did not mention the *West Virginia Rules of Evidence. W.Va.R.Evid.* 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Thus, Rule 702 of the *West Virginia Rules of Evidence* provides a more lenient standard for admissibility of expert testimony than *Frye's* and *Clawson's* "general acceptance" test.

An increasing number of the courts and many of the leading commentators interpret Rule 702 of the *Federal Rules of Evidence,* which is identical to our Rule 702, as limiting the *Frye* "general acceptance" test to a test solely for determining whether *judicial notice* can be taken of the scientific test's general reliability. *See* P. Giannelli and E. Imwinkelried, *Scientific Evidence* §§ 1–5, 1–5 (E)–(F), 1–6, 1–6(A)–(D) (1986) (collecting authorities); Giannelli, *General Acceptance of Scientific Tests*—Frye *and Beyond,* in *Scientific and Expert Evidence* 11–32 (E. Imwinkelried 2d ed. 1981). Therefore, according to this view, a

scientific expert's testimony is admissible if shown to involve relevant scientific tests which assist the trier of fact to understand the evidence, even if such tests and the underlying scientific principle(s) are not yet generally accepted in the particular scientific field. For example, this Court recently upheld, under *W.Va.R.Evid.* 702, the admissibility, in certain circumstances, of expert testimony on rape trauma syndrome, and we concluded that *Frye's* "general acceptance" test did not govern the admissibility question. *State v. McCoy,* 179 W.Va. 223, 366 S.E.2d 731 at 736 n. 9 (1988).

We, like the court in *United States v. Downing,* 753 F.2d 1224, 1241 (3d Cir.1985), believe that an *in camera* hearing must be conducted in criminal cases to determine the relevancy of scientific or technical evidence under Rule 702 of the *West Virginia Rules of Evidence,* and, under Rule 403 of the *West Virginia Rules of Evidence,* to balance the probative value (including reliability) of such evidence against the danger of unfair prejudice. An *in camera* hearing is not necessary, however, where the trial court can properly take judicial notice of the general acceptance of the scientific principle in the particular scientific field. The latter is true here, as discussed *infra* in the body of this opinion. We therefore leave for future development, in cases where the point is fairly raised, an analysis of the detailed factors to be considered by a trial court in conducting the *in camera* hearing discussed in this paragraph.

in cheese).[5]

While there is no unanimity of opinion among forensic dentists as to the best bite-mark comparison techniques or as to the minimum number of points of identity between the bite mark and the suspect's dentition, "forensic odontology, inclusive of bite mark identification, is an exact science. It is exact in the sense that through acceptable scientific procedures [requiring a skilled expert], an expert can form an opinion useful to the courts in their quest for the truth." *State v. Sager,* 600 S.W.2d 541, 569 (Mo.Ct.App.1980), *application to transfer denied* (Mo. July 15, 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). All of the experts agree it is easier to "rule out" a suspect by bite-mark comparison techniques than it is to "rule in" a suspect thereby, as *one* unexplained inconsistency between the bite mark and the suspect's dentition means the suspect could not have made the bite mark. *Sager,* 600 S.W.2d at 564, 567; *Kennedy v. State,* 640 P.2d 971, 976 (Okla.Crim.App. 1982); P. Giannelli and E. Imwinkelried, *Scientific Evidence* § 13–3, at 375 (1986); Sperber, *Forensic Odontology,* in *Scientific and Expert Evidence* 723, 752 (E. Imwinkelried 2d ed. 1981).[6]

Many of the courts have emphasized that the reliability of bite-mark evidence, unlike most scientific evidence, is, when presented properly in the particular case, readily apparent; it is a "common sense" type of comparison of physical evidence which lends itself readily to verification and

---

**5.** *See also Handley v. State,* 515 So.2d 121 (Ala. Crim.App.1987), *cert. denied* (Ala. Oct. 16, 1987); *State v. Garrison,* 120 Ariz. 255, 585 P.2d 563 (1978) (en banc); *People v. Slone,* 76 Cal.App.3d 611, 143 Cal.Rptr. 61 (1978), *hearing denied* (Cal. Mar. 2, 1978); *People v. Watson,* 75 Cal. App.3d 384, 142 Cal.Rptr. 134 (1977), *hearing denied* (Cal. Feb. 22, 1978); *People v. Marx,* 54 Cal.App.3d 100, 126 Cal.Rptr. 350 (1975) (one of the most cited cases); *State v. Ortiz,* 198 Conn. 220, 502 A.2d 400 (1985) (bite mark in apple); *State v. Asherman,* 193 Conn. 695, 478 A.2d 227 (1984), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985); *Bundy v. State,* 455 So.2d 330 (Fla.1984) (much publicized case), *cert. denied,* 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); *Smith v. State,* 253 Ga. 536, 322 S.E.2d 492 (1984); *People v. Prante,* 147 Ill.App.3d 1039, 101 Ill.Dec. 565, 498 N.E.2d 889 (1986), *cert. denied,* 113 Ill.2d 582, 106 Ill.Dec. 53, 505 N.E.2d 359 (1987); *People v. Williams,* 128 Ill.App.3d 384, 83 Ill.Dec. 720, 470 N.E.2d 1140 (1994), *cert. denied* (Ill. Jan., 1985 term); *People v. Milone,* 43 Ill.App.3d 385, 2 Ill.Dec. 63, 356 N.E.2d 1350 (1976); *People v. Johnson,* 8 Ill.App.3d 457, 289 N.E.2d 722 (1972); *Niehaus v. State,* 265 Ind. 655, 359 N.E.2d 513, *cert. denied,* 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977); *Commonwealth v. Cifizzari,* 397 Mass. 560, 492 N.E.2d 357 (1986); *State v. Turner,* 633 S.W.2d 421 (Mo.Ct.App.1982); *State v. Kleypas,* 602 S.W.2d 863 (Mo.Ct.App.1980), *application to transfer denied* (Mo. Sept. 9, 1980); *Bludsworth v. State,* 98 Nev. 289, 646 P.2d 558 (1982); *People v. Bethune,* 105 A.D. 262, 484 N.Y.S.2d 577 (1984); *State v. Green,* 305 N.C. 463, 290 S.E.2d 625 (1982); *State v. Temple,* 302 N.C. 1, 273 S.E.2d 273 (1981); *State v. Routh,* 30 Or.App. 901, 568 P.2d 704 (1977); *State v. Jones,* 273 S.C. 723, 259 S.E.2d 120 (1979); *Patterson v. State,* 509 S.W.2d 857 (Tex.Crim.App.1974); *State v. Howe,* 136 Vt. 53, 386 A.2d 1125 (1978); *Harward v. Commonwealth,* 5 Va.App. 468, 364 S.E.2d 511 (1988); *State v. Stinson,* 134 Wis.2d 224, 397 N.W.2d 136 (1986).

We are aware of one opinion in which the bite-mark evidence was held to be inadmissible because the witness was not qualified as a forensic dentist. *State v. Adams,* 481 A.2d 718 (R.I.1984).

*See generally* C. Torcia, *Wharton's Criminal Evidence* § 571, at 344, 350, 353–54 n. 4 (14th ed. 1987); P. Giannelli and E. Imwinkelried, *Scientific Evidence* §§ 13–1, 13–3 to 13–5 (1986); Sperber, *Forensic Odontology,* in *Scientific and Expert Evidence* 721–54 (E. Imwinkelried 2d ed. 1981); annotation, *Admissibility of Evidence Tending to Identify Accused by His Own Bite Marks,* 77 A.L.R.3d 1122 (1977).

**6.** A few of the commentators have been somewhat critical of the general reliability of bite-mark evidence. *See, e.g.,* A. Moenssens and F. Inbau, *Scientific Evidence in Criminal Cases* §§ 16.05, 16.07, 16.08 (2d ed. 1978); *Annual Survey of South Carolina Law—Evidence—Expert Testimony—Forensic Odontology and Bite-Mark Evidence,* 32 S.C.L. Rev. 119 (1980); Note, *The Admissibility of Bite Mark Evidence,* 51 S.Cal.L.Rev. 309 (1978). One of the critics' primary concerns is that there is insufficient data, compared with fingerprint data, to make a positive identification. This concern was answered in *State v. Sager,* 600 S.W.2d 541, 570 (Mo.Ct. App.1980), *application to transfer denied* (Mo. July 15, 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981):

While most experts agree that such basic core data would enhance the specificity of any given case, they also seem to agree that the absence of such data is not an element which defeats this scientific procedure. The absence of such core data was likened to the early days of fingerprinting....

understanding. The judge and the jury can see the extent to which the bite mark conforms to the suspect's teeth.[7]

■ Based upon our review of the authorities, this Court holds that the general reliability of bite-mark evidence as a means of positive identification is sufficiently established in the field of forensic dentistry that a court is authorized to take judicial notice of such general reliability without conducting a hearing on the same. When the witness at trial has the requisite skill and experience and demonstrates the accuracy and reliability of the models, photographs and any other physical evidence utilized in that particular case as bite-mark evidence, the trial court may properly admit the opinion testimony of the expert witness as a valuable aid to a jury in understanding the evidence in a criminal case.

### III

### NARRATIVE TESTIMONY OF AN EXPERT WITNESS

■ When asked to explain how he conducted the bite-mark comparisons in this case, Dr. Sopher, with the trial court's permission and without objection by the appellant, stepped down from the witness stand, stood in front of the jury and, in explaining the bite-mark evidence, testified in lecture or narrative form, virtually uninterrupted, for the remainder of his direct examination, which covered about twenty-five pages of transcript. The appellant moved for a mistrial, based upon the lengthy "argumentative" manner in which Dr. Sopher testified. Finding that Dr. Sopher's testimony did not actually constitute legal argument, the trial court denied the appellant's motion for a mistrial.

The appellant assigns as error the trial court's denial of his motion for a mistrial. The appellant emphasizes that the expert testimony of Dr. Sopher was critical to the State's case, as it had only fairly weak circumstantial evidence otherwise. Thus, the appellant argues that the alleged error in the form of Dr. Sopher's testimony, precluding objections such as "already asked and answered," was so prejudicial as to necessitate a mistrial. Under the particular circumstances of this case, we disagree.

Rule 611(a) of the *West Virginia Rules of Evidence* provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." This evidentiary rule is consistent with the common law in this State: "A trial court has wide latitude in the conduct of a trial, and particularly in matters pertaining to the examination of witnesses, and its rulings in relation to the examination of witnesses will not be reversed except when there has been a plain abuse of its discretion." Syl. pt. 2, *Payne v. Kinder*, 147 W.Va. 352, 127 S.E.2d 726 (1962). The discretion of the trial court to control the mode of interrogation of witnesses has been recognized in criminal cases in this State. *See* syl. pt. 6, *State v. Fairchild*, 171 W.Va. 137, 298 S.E.2d 110 (1982) (leading questions). In practice, abuse of this discretion is more often found when the trial court has unduly curbed the examination than when the trial court has permitted an undue extension of the examination. *State v. Altergott*, 57 Haw. 492, 506, 559 P.2d 728, 737 (1977).

■ An example of the trial court's discretion as to the examination of witnesses is the principle that the trial court is vested with sound discretion to permit a witness to testify in narrative form, rather than by question and answer. *See, e.g., Foreman v. State*, 50 Ala.App. 236, 239, 278 So.2d

---

7. Some of the courts admitting bite-mark evidence reached that conclusion by applying the *Frye* "general acceptance" test, *see supra* note 4, while other courts reached the same conclusion by holding *Frye* to be inapplicable, either because *Frye* had been supplanted by rules of evidence like *W.Va.R.Evid.* 702, *see supra* note

4, or because *Frye* was deemed not to apply to physical comparisons readily verifiable by non-expert jurors, thus obviating the typical concern with scientific tests that the trier(s) of the facts might be unduly influenced by expert testimony.

238, 241 (1973) (toxicologist testifying for the state); *Jones v. State*, 477 N.E.2d 353, 358 (Ind.Ct.App.1985) (psychiatrist testifying for the state), *transfer denied* (Ind. Nov. 19, 1985); *Coble v. State*, 476 N.E.2d 102, 106 (Ind.1985) (court-appointed psychiatrist; narrative testimony precluded objections and resulted in inadmissible testimony cured by instruction; mistrial motion properly denied); *State v. Wall*, 452 So.2d 222, 226 (La.Ct.App.1984) (trial court required defense counsel to move to strike each time state's witness testified improperly during narrative, rather than allowing a general objection to form of testimony; no abuse of discretion).

Under *W.Va.R.Evid.* 702, quoted in its entirety in note 4 *supra*, an expert witness may testify "in the form of an opinion or otherwise." *Fed.R.Evid.* 702 is identically worded. The notes of the advisory committee with respect to this federal evidentiary rule include this statement: "[A]n expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, ..." Professor Cleckley, in referring to this statement, concludes: "An expert under Rule 702 is, therefore, permitted to lecture to the jury." F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 7.1(B)1., at 420 (2d ed. 1986). *See also* S. Saltzburg and K. Redden, *Federal Rules of Evidence Manual* 631 (4th ed. 1986); G. Joseph and S. Saltzburg, *Evidence in America: The Federal Rules in the States* ch. 51, at 4 (1987) (ABA Sec. Litigation, Trial Evidence Committee).

In the present case the trial court, without objection by the appellant, permitted Dr. Sopher to testify in narrative or lecture form in order to explain to the jury the physical comparisons which led to his opinion that the appellant, to the exclusion of all other individuals, had made · the bite marks in the paper towel. The appellant eventually objected to Dr. Sopher's repeating, as to each tooth, the exactness of the match between the bite-mark pattern in the paper towel and the appellant's dentition. The trial court instructed Dr. Sopher not to repeat, in minute detail, each point of identity. In addition, as stated previously, *one* unexplained inconsistency between the bite mark and the suspect's dentition means the suspect could not have made the bite mark. It was therefore critical to "ruling in" the appellant that there was an exact match at each point.

In this regard we note that several of the bite-mark cases expressly state that the testimony of the forensic dentist(s) contained a detailed and extensive demonstration and explanation of the physical evidence and comparisons to the jury. *See, e.g., Bundy v. State*, 455 So.2d 330, 336 (Fla.1984), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); *State v. Peoples*, 227 Kan. 127, 132–33, 605 P.2d 135, 140 (1980); *Kennedy v. State*, 640 P.2d 971, 975, 976, 978 (Okla.Crim.App. 1982); *State v. Stinson*, 134 Wis.2d 224, 230, 235, 397 N.W.2d 136, 138, 140 (1986).

Accordingly, this Court holds that the trial court here did not abuse its discretion in denying the appellant's motion for a mistrial. "The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case [upon the motion of a criminal defendant] is a matter within the sound discretion of the trial court." *State v. Williams*, 172 W.Va. 295, 304, 305 S.E.2d 251, 260 (1983). *See also State v. Craft*, 131 W.Va. 195, 204, 47 S.E.2d 681, 687 (1948).

## IV

### INSTRUCTION ON WEIGHT OF EXPERT TESTIMONY

■ Upon the trial court's denial of the appellant's motion for a mistrial based upon the form of Dr. Sopher's testimony, the appellant did not then move for a cautionary instruction on the jury's not giving undue weight to expert testimony. The appellant did later request, during settling of instructions, that the trial court give an instruction to the effect that the jurors should not give excessive weight to expert testimony.[8] The trial court, over objection,

---

**8.** The instruction requested by the appellant

stated in relevant part:

refused to give the appellant's instruction. It believed that the substance thereof was adequately covered by the court's charge to the jury, which included this language: "You are not bound to accept an expert opinion as conclusive, as you are the judges of the facts, but you should give to it the weight that you find it to be entitled." The court's charge also stated that the jurors "may also consider the qualifications and credibility of the experts."

■ The appellant assigns as error the trial court's refusal to give his instruction on the weight of the expert testimony. This assignment of error is without merit. We agree with the trial court that the substance of the requested instruction was adequately covered by the court's charge to the jury. "It is not reversible error to refuse to give instructions offered by a party that are adequately covered by other instructions given by the court." Syl. pt. 20, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966). *Accord, State v. Dudley*, 178 W.Va. 122, 127, 358 S.E.2d 206, 211 (1987); *State v. Brown*, 177 W.Va. 633, 642, 355 S.E.2d 614, 623 (1987); syl. pt. 2, *State v. Hamilton*, 177 W.Va. 611, 355 S.E.2d 400 (1987); syl. pt. 6, *State v. Thompson*, 176 W.Va. 300, 342 S.E.2d 268 (1986); syl. pt. 3, *State v. Evans*, 172 W.Va. 810, 310 S.E.2d 877 (1983); syl. pt. 5, *State v. Ashcraft*, 172 W.Va. 640, 309 S.E.2d 600 (1983); syl. pt. 4, *State v. Helmick*, 169 W.Va. 94, 286 S.E.2d 245 (1982); *State v. Scotchel*, 168 W.Va. 545, 554, 285 S.E.2d 384, 390 (1981).

■ Moreover, as discussed previously in section II of this opinion, bite-mark evidence, unlike most scientific evidence, lends itself readily to verification and understanding by the triers of the facts; they can see the extent to which the bite mark conforms to the suspect's teeth. Therefore, the jurors in a bite-mark case are not likely to give undue weight to the expert's testimony, and the trial court need not, *sua sponte* or on request, instruct the jury specifically that expert testimony is not to be given peculiar weight. An instruction in such a case which tells the jury that it is to determine the weight to be given to expert testimony is sufficient.

## V

### INSTRUCTIONS ON EYEWITNESS IDENTIFICATION

The appellant assigns as error the trial court's refusal, over objection, to give his instructions numbers 19 and 20 on eyewitness identification. Again, we disagree.

First, with respect to appellant's instruction number 19,[9] the substance thereof was adequately covered by appellant's instruction number 1, as amended favorably to him without objection. *See infra* note 11. Dispositive are the authorities cited in the immediately preceding section of this opinion (section IV) on instructions properly refused because the substance thereof was adequately covered by other instructions of the court. Similarly, syllabus point 5 of *State v. Craft*, 131 W.Va. 195, 47 S.E.2d 681 (1948), is dispositive: "It is not error to refuse instructions the substance of which has been adequately covered by other instructions given on behalf of the same person who offered the instruction refused."

■ With respect to appellant's instruc-

---

You are instructed that you may consider the testimony of such [expert] witnesses and give it such weight and value as you think it should have. You should not give undue or excessive weight to any such testimony simply because it may seem to be of a scientific or technical nature, particularly if you find the same to be inconsistent or in conflict with other evidence in the case which you may find relative or persuasive in your determinations. In other words, you are not required to surrender your own judgment based on the evidence, to that of any person testifying as an expert, or to give controlling effect to that testimony, for the testimony of an expert, like that of any other witness, is to be received [reviewed?] by you and given such weight and value as you deem it entitled to receive.

9. Appellant's instruction number 19 stated:

One of the issues in this case is the identification of the person who committed the crime charged in this case. The prosecution has the burden of proving, beyond a reasonable doubt, not only that the crime charged was committed, but that Keith Armstrong was the person who committed it.

tion number 20,[10] the *substance* thereof was adequately covered by this language in the court's charge, albeit in less precise terms: "[T]o ... determine the credit and weight you will give the testimony of witnesses, you should ... take into consideration ... the opportunity and means, or lack of opportunity and means, of having knowledge of the matters concerning which the witness testified; [and] the reasonableness or unreasonableness of such testimony; ..." Appellant's instruction number 20 would have been more appropriate if there had been a direct eyewitness identification of the appellant. Here, the State's witnesses, Mr. James and Mr. Summey, did *not* make a direct eyewitness identification of the appellant. Instead, they indirectly identified the robber by describing certain of his characteristics and his clothing and gun. However, due to the ski masks and dim light, Mr. James and Mr. Summey were *unable* to identify directly the appellant as the robber. Appellant's instruction number 20 was therefore misleading and was properly refused.

## VI

### INSTRUCTION ON ALIBI

A final instructional error alleged by the appellant is that *his* instruction number 1, as amended favorably to him without objection, was confusing as given and should have been corrected by the court so that the jury would not have been misled as to the burden of proof in this case.[11] There is no merit to this assignment of error.

In syllabus point 1 of *State v. Dozier*, 163 W.Va. 192, 255 S.E.2d 552 (1979), the Court held: "A defendant may challenge, on appeal, the propriety of instructions tendered by him and given by the court if the challenge is based on a violation of due process." In syllabus point 2 of *Dozier* the Court held: "When given, instructions to a jury are the court's instructions and, irrespective of who requests them, the court must see to it that all instructions conform to constitutional requirements." *See also* syl., *State v. Lambert*, 173 W.Va. 60, 312 S.E.2d 31 (1984). On the other hand, a limiting factor to the application of these principles is that the erroneous instruction must substantially impair the truth-finding process in order to be noticed as plain error:

> Although this Court may, under Rule 30 of the West Virginia Rules of Criminal Procedure, notice plain error in the giving of an erroneous instruction (in the absence of a proper and timely objection at trial), this Court will not ordinarily recognize plain error under such circumstances, even of constitutional magnitude, where the giving of the erroneous instruction did not substantially impair the truth-finding function of the trial.

Syl. pt. 2, *State v. Hutchinson*, 176 W.Va. 172, 342 S.E.2d 138 (1986). In *Hutchinson* this Court declined to notice plain error of

---

**10.** Appellant's instruction number 20 stated:

In this case, certain witnesses have been called concerning the events at the Fifth Quarter Restaurant and the features and particulars of the person there who may have committed the offense charged. In considering the particulars of their testimony upon identification of that person, you should consider the following: The witnesses' opportunity to observe any criminal act and the person committing it, including the length of time available for observing; whether the witnesses had occasion to see or know the person before the incident; the distance between the various parties; the light or lack of light at the time; the witnesses' state of mind at the time of the offense; and other circumstances affecting the witnesses' opportunity to observe the person committing the offense.

**11.** Appellant's instruction number 1, as amended favorably to him without objection, stated:

In this case, the defendant has denied guilt and *has offered the defense of alibi. Therefore* [emphasis by the appellant], it is the burden of the State to prove, in addition to the fact that a crime was committed, that Keith Armstrong was, beyond a reasonable doubt, the person who committed it [*see supra* note 9]. If you believe that the evidence in this case, both direct and circumstantial, is consistent with the commission of a crime by a person other than the defendant or that the evidence does not prove the identity of the defendant beyond a reasonable doubt [*see supra* note 9], then you shall ["should," as offered by the appellant] find him not guilty.

constitutional magnitude in the giving of the defendant's instruction *expressly* placing the burden of proof of an alibi defense upon the *defendant.* We concluded that such instruction did not substantially impair the truth-finding function of the trial.

In the present case the appellant argues that a part of his instruction number 1, as amended, *impliedly* placed the burden of proof upon the State to prove commission of the offense by the appellant beyond a reasonable doubt *solely* because the appellant had raised an alibi defense. The remainder of this instruction dispels this purported implication: "If you believe ... that the evidence does not prove the identity of the defendant beyond a reasonable doubt, then you shall find him not guilty." Other parts of the court's charge and State's instruction number 1, given as amended, also indicate in unmistakable terms that the State, with or without an alibi defense, had the burden of proving beyond a reasonable doubt that the appellant committed the offense charged:

> The presumption of innocence stays with the defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies you of the defendant's guilt beyond a reasonable doubt. The defendant is not required to prove his innocence.
>
> The burden of proving the defendant guilty of every element of the crime charged is upon the State....
>
> ....
>
> If ... you believe that the evidence does not show the guilt of the defendant beyond a reasonable doubt, or that the State has failed to prove any one or more elements of the offense charged beyond a reasonable doubt, or that the evidence is consistent with a reasonable theory of innocence, then you shall find the defendant not guilty.

In any event, any error in giving appellant's instruction number 1, as amended, did not substantially impair the truth-finding function of the trial, and, under *Hutch-*

*inson,* any such error was not preserved for review.

## VII

### EXAMINATION OF EXHIBITS BY JURY

■ A final assignment of error is that the trial court should not have allowed the jury to take the bite-mark exhibits (the paper towel, photographs and negatives, casts, wax impressions, etc.) with them during deliberations. The appellant argues that the jury should not have been permitted, over his objection, to "experiment" with these exhibits admitted into evidence. Again, we hold that this assignment of error is without merit.

■ It would be improper for the jury to experiment, out of the presence of the accused, with an article which had been introduced in evidence, in a manner otherwise than had been shown in the trial, for such would be, in effect, taking evidence out of the presence of the accused. *State v. Panetta,* 85 W.Va. 212, 222, 101 S.E. 360, 364 (1919) (inconceivable how jury could have "experimented" with decedent's coat). On the other hand, the jury, during deliberations, may use an exhibit, admitted into evidence, according to its nature and within the bounds of the evidence at trial in order to aid the jury in weighing the evidence, and the jury may make a more critical examination of an exhibit than was made during the trial. *See, e.g., People v. Kurena,* 87 Ill.App.3d 771, 775–76, 43 Ill. Dec. 277, 282, 410 N.E.2d 277, 282 (1980); *State v. Everson,* 166 Wash. 534, 536–37, 7 P.2d 603, 604 (1932); *Espy v. State,* 54 Wyo. 291, 312, 92 P.2d 549, 556 (1939). *See generally* annotation, *Propriety of Juror's Tests or Experiments in Jury Room,* 31 A.L.R. 4th 566 (1984).

In this case there is nothing to indicate that the jury somehow experimented with the bite-mark evidence, as opposed to merely examining the same in detail to verify Dr. Sopher's testimony that the appellant's teeth matched the bite mark in the paper towel.

For the foregoing reasons the judgment of conviction is affirmed.

Affirmed.